No. 70,479

S<small>TATE OF</small> K<small>ANSAS</small>, *Appellee*, v. J<small>AMES</small> L. H<small>UNT</small>, *Appellant*.

(894 P.2d 178)

Opinion filed April 21, 1995.

*Thomas Jacquinot*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, James L. Hunt, from his conviction for second-degree murder. He claims error concerning the self-defense instruction and the witness credibility instruction, in being sentenced as a habitual offender (third offense), in the failure to provide allocution, and in the imposition of a sentence of 45 years to life.

The victim, Nehemiah Martin, lived with his girlfriend and her children in the same apartment building as the defendant. Defendant and Martin were drinking companions.

Martin and the defendant had a serious altercation a week before the shooting, culminating in Martin striking the defendant at least 30 times with a clothes iron. The defendant was un-

cooperative with police when they arrived, and the responding officer testified the defendant stated that he did not want to prosecute Martin and that they had fought about money. The defendant was intoxicated and bleeding profusely, and he had to be forcibly taken to the hospital for medical treatment. The defendant had 11 or 12 lacerations which required stitches.

The day after the beating, the defendant purchased a .25 caliber gun at a pawn shop.

A tenant who witnessed the iron beating testified Martin later told the tenant that he had taken the defendant's money and that he beat the defendant with an iron because the defendant pulled a fork on him. Martin also told the tenant that if the defendant said anything to him he would do it again. The defendant told this tenant that he was going to let Martin feel the same pain he felt by shooting Martin in the head.

The day after the iron beating, Martin told the manager of the apartment building about the incident, stating that the defendant had been calling his girlfriend names and had tried to scratch him with fingernail clippers. The manager also spoke with the defendant, who threatened to shoot Martin to let him (Martin) know the same pain he (the defendant) felt. That evening the manager went to the defendant's apartment and the defendant again said he was going to shoot Martin in the head. The next day the manager evicted the defendant for violating his lease. When the defendant was moving out the manager told him it was not worth it to shoot Martin, and the defendant replied that he had to do what he had to do. The manager warned Martin of the threat, who laughed it off.

On the day of the shooting, the defendant was drinking and smoking cigarettes in a friend's car. He saw Martin on the street, approached him, and asked Martin why he had beaten him and taken his money. Martin pushed the defendant aside. The defendant then shot Martin two times.

The defendant was arrested at the scene. He made no attempt to flee or give aid to the victim. He walked across the street, lit a cigarette, and drank a beer while waiting for the police. He admitted to shooting Martin. One police officer testified the de-

fendant stated, "I got who I wanted. I don't want any more trouble." After being Mirandized, the defendant gave a statement. He told of the beating by Martin a week earlier and indicated he thought Martin robbed him of $100 that night. The defendant stated he purchased a gun at a pawn shop to defend himself because he heard that Martin had a gun. The defendant told the police that he wanted to hurt Martin but did not want to kill him.

At trial, the defendant testified he shot Martin in self-defense. He testified he saw Martin coming down the street and approached Martin to ask why Martin had beaten him. Martin shoved the defendant. The defendant saw Martin throw something down. Martin turned and had his hand inside his pocket or inside his coat, which was partially zipped up. The defendant thought Martin was going to shoot him, so the defendant pulled out his gun and shot Martin two times. The defendant testified that he did not intend to kill Martin.

Martin was pronounced dead shortly after the shooting. One bullet entered the left chest and after passing through the lung and heart it lodged near the rib cage; the other entered the left nostril and exited the right cheek.

The jury convicted the defendant of second-degree murder. He was sentenced pursuant to the Habitual Criminal Act to 45 years to life. He appeals.

## I. "INITIAL AGGRESSOR" INSTRUCTION

The trial court instructed the jury on the defendant's claim of self-defense, including the following instructions:

### INSTRUCTION 10

"A person is not permitted to provoke an attack on himself with the specific intention to use such attack as a justification for inflicting bodily harm upon the person he provoked and then claim self-defense as a justification for inflicting bodily harm upon the person he provoked."

### INSTRUCTION 11

"A person who initially provokes the use of force against himself is not justified in the use of force to defend himself unless:

"1. He has reasonable ground to believe that he is in present danger of death or great bodily harm, and he has used every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to other person; or

"2. He has in good faith withdrawn and indicates clearly to the other person that he desires to withdraw and stop the use of force, but the other person continues or resumes the use of force."

These instructions were based on K.S.A. 21-3214 and are consistent with the language of that statute and are taken from PIK Crim. 3d 54.21 and 54.22. There is no claim that the language of instructions 10 and 11 was erroneous. Rather, the defendant argues that the district court should not have given the instructions at all.

The defendant objected to these instructions, arguing that there was no evidence the defendant provoked an attack from Martin or anyone else. The court overruled the objection, reasoning that the evidence showed the defendant was the one who approached Martin; there was no evidence that Martin approached the defendant.

This court has stated:

"Jury instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous." *State v. Walker*, 252 Kan. 279, 295, 845 P.2d 1 (1993).

The defendant acknowledges that an initial aggressor's right to use self-defense is limited. He argues the evidence is uncontroverted that the exchange between Martin and the defendant just before the shooting was brief. Martin owed the defendant money and had a week before the shooting brutally beaten the defendant. The defendant sought to talk to Martin when he saw Martin on the street. The defendant argues that at that point either the defendant shot Martin when he saw Martin go for what the defendant believed was a gun, or the defendant simply walked up to Martin and shot him in retaliation for the earlier beating.

The defendant contends there was no evidence that he provoked Martin into reaching for a gun or bluffing that he had a gun. He reasons that the "middle ground" indicated by the initial aggressor instructions does not exist under these facts.

The defendant argues that giving these instructions was prejudicial because they may have confused the jury into thinking that the defendant had a duty to retreat. He also reasons that the jury may have been misled into thinking that the defendant had no right to talk to Martin about the beating and about the money he claimed Martin owed him.

The State cites *State v. Beard*, 220 Kan. 580, 552 P.2d 900 (1976). There, the defendant and the victims became embroiled in a fight. After being beaten by the victims, the defendant left the premises. He returned an hour later, said "I told them I would be back," and went into one victim's apartment. The victims followed the defendant into the apartment within a few minutes. Two shots were then heard coming from the apartment. 220 Kan. at 581. The district court instructed the jury on self-defense and included language nearly identical to that used in instructions 10 and 11 in the case at bar. The defendant did not object to the instruction at trial. This court stated:

"The instruction accords with the pertinent statutes . . . and is a correct statement of the law. The instruction, as we read it, does not declare the defendant to be the aggressor, but merely informs the jury of the statutory provisions pertaining to the use of force . . . as well as instructing the jury as to the right of self-defense and limitation on the force to be used by one in defending himself from unlawful attack. Whether defendant was an aggressor remained a question for the jury. There was ample evidence in this case which would have justified the jury in finding that defendant was an aggressor.

". . . The instruction given was applicable to the evidence in the instant case. On the state of the record we find no error in the giving of the instruction, much less 'clear error' which would be required to warrant reversal in the absence of defendant's objection at trial." 220 Kan. at 582.

The State argues that *Beard* is dispositive. The State points out that as in *Beard*, the defendant was beaten and there was a break in the action. Beard returned to the site of the beating after an hour; the defendant approached Martin after a week had elapsed. Beard said "I told them I would be back"; the defendant told others he was going to shoot Martin in the head.

Instructions 10 and 11 are correct statements of the law. The jury was not instructed that the defendant was an initial aggressor or that the defendant had provoked Martin into reaching for what the defendant thought was a gun. As in *Beard*, the question of whether the defendant was an aggressor was one for the jury. If the jury did not find that the defendant was an aggressor, it could disregard the limit on the defendant's right to use self-defense. Instructions 10 and 11 were not misleading or so confusing that the district court erred in giving them. We do not find error on this issue.

## II. WITNESS CREDIBILITY

Both the State and the defendant requested an instruction on witness credibility using the language of PIK Crim. 3d 52.09:

"It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified."

The district court instead gave an expanded instruction:

"It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use that knowledge and experience which you possess in common with men in general in considering the testimony of each witness.

"You also may take the following factors into consideration when weighing a witness's testimony:

"1. the witness's ability and opportunity to observe and know the things about which he had testified;

"2. the clarity and accuracy of the witness's memory;

"3. the witness's manner and conduct while testifying;

"4. any interest the witness may have in the result of the trial;

"5. the reasonableness of the witness's testimony when considered in light of all the evidence in the case; and

"6. any bias, interest, prejudice or motive the witness may have."

The defendant did not object to the language in the instruction given by the court. Our standard of review is as follows:

"No party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of the objection, unless the instruction is clearly erroneous. K.S.A. 22-3414(3). An instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if

the trial error had not occurred there is a real possibility the jury would have returned a different verdict." *State v. Crawford,* 255 Kan. 47, Syl. ¶ 5, 872 P.2d 293 (1994).

The defendant contends that the expanded instruction given by the court unduly focused on his credibility by permitting the jury to consider "any interest the witness may have in the result of the trial." He reasons that the instruction violated two fundamental rights: the presumption of innocence and the right to testify on one's own behalf. The defendant has the most obvious and greatest interest in the outcome of the trial, yet he is presumed innocent. The defendant suggests that the instruction called special attention to his testimony and told the jury to be suspect of his testimony because of his interest in the outcome of the trial.

The defendant also points out that the State called attention to this instruction in its closing argument:

"There's a specific instruction about you deciding the credibility of the witnesses based upon their demeanor and so forth and so on. That means how they look. How did they look to you? How do you eyeball them? How do you size them up? Look back to what his body language was under cross-examination and compare that to the lab investigator and the guys from the transmission shop [who witnessed the shooting] and also recall that he wasn't able to tell me this thing that Nehemiah [*sic*] pulled out of his jacket, what color was it, how long was it, what was it, what Nehemiah [*sic*] did with it, and you decide if there's any credibility or any sense at all to what this defendant—his defense is trying to be.

Both the defendant and the State talked during closing argument about whether the defendant's testimony was suspect.

This court has continually disapproved the giving of an expanded version of the credibility instruction similar to the instruction given by the district court here. Although giving the expanded instruction is erroneous, this court has continually held that it is not clearly erroneous. See *State v. Castoreno,* 255 Kan. 401, 407, 874 P.2d 1173 (1994); *State v. Clements,* 241 Kan. 77, 80-81, 734 P.2d 1096 (1987); *State v. Willis,* 240 Kan. 580, 586-87, 731 P.2d 287 (1987). In *Castoreno,* 255 Kan. at 403-04, the instruction given by the district court included factors on credibility similar to those in the instruction in the case at bar but was even more extensive. This court stated:

"Although it was error to give the expanded instruction, it was not clearly erroneous to do so. The trial judge should not give an instruction that this court has found it is the better practice not to give, particularly where reversal is dependent upon the potential for unfair impeachment of the defendant in the peculiar circumstances of the case and whether the defendant objects to the instruction. We disapprove of the language of the instruction used in the present case concerning the credibility of certain witnesses beyond the specific language of PIK Crim. 3d 52.09." 255 Kan. at 407.

The trial court had also improperly instructed the jury as to the elements of the offenses charged in *Castoreno*. This court held that the erroneous elements instruction was not harmless error and further that the cumulative effect of the erroneous elements and credibility instructions was clearly erroneous and required reversal. 255 Kan. at 410-11.

The expanded credibility instruction given by the district court here, while erroneous, was not clearly erroneous. The instruction did not highlight the defendant's credibility or emphasize any factor of his testimony. The defendant was not the only witness with an interest in the outcome of the trial; Martin's girlfriend, an important witness to the events surrounding the iron beating, had an interest in seeing his alleged killer convicted. The presumption of innocence was not diminished by the instruction, and the defendant was not dissuaded from testifying on his own behalf. While this court has repeatedly held that the expanded instruction is erroneous, we cannot say that there was clear error or that the error requires reversal here.

## III. THE HABITUAL CRIMINAL ACT

The defendant's next claims of error relate to sentencing. The chain of events is somewhat complex.

On the first day of trial, the State filed a motion to impose the Habitual Criminal Act (HCA). The State cited two prior convictions: "Aggravated Assault, on 9-29-80, Case No. 12341B, in Gregg County, Texas" and "Aggravated Robbery, on 1-23-86, Case No. 15176A, in Gregg County, Texas." Sentencing was initially scheduled for June 29, 1993, but was continued at the State's request because documentation relating to the defendant's prior convictions had not been received.

A sentencing hearing was held on July 1, 1993. At that time, the State indicated it had received documentation from Texas to support only one prior conviction. The State requested a continuance, the defendant objected, and the State then indicated that it was happy to receive a continuance or happy to proceed. The court's ruling is somewhat confusing:

"Well, it doesn't help the Court any. It looks like I would be the one who has more interests than the District Attorney, I'll concede. I want to put in the record that this voluminous record that's shown by the PSI in the way the Court looks at his obligation and having heard this case, I had the tendency to give that continuance, but I've already said that I'm going to continue it today because I was informed that the District Attorney says they'd be happy for the continuance, happy to proceed. I'm certainly not going to take a prosecutory position. I think that's a good reason, be a rationally-taken position by the upper court. We'll proceed."

The State provided documentation that the defendant was convicted of aggravated assault on September 29, 1980, case number 12341-B in Gregg County, Texas. The court stated: "[T]he State's authorized the Habitual Criminal Act, the usage of it, and it is a discretionary matter with the Court as to the one being offered." The defendant's counsel clarified for the record that the sentencing range was a minimum of 5 to 20 years and a maximum of 30 years to life.

The defendant then pointed out that the court was required to calculate what the defendant's guidelines sentence would be pursuant to what is now K.S.A. 1994 Supp. 21-4724(f) because due to the prior continuance the sentencing hearing was being held on July 1, 1993, the first day the guidelines became effective. The defendant argued that under the guidelines his criminal history should be category D, one prior person felony, because the State was unable to provide proof of any other convictions. The State disagreed that the defendant's criminal history was category D. At that time the court stated, "It's going to be two with Habitual, isn't it?" The State pointed out that according to the PSI, the defendant had four prior person felonies. At that time, the defendant's counsel stated that he had not filed an objection to the criminal history set forth in the PSI, as required by the sentencing guidelines act, because the sentencing hearing was initially

scheduled to take place prior to July 1, 1993. However, the defendant's counsel stated that he did not want additional time to file the requisite notice, believing it unnecessary because a guidelines sentence would not actually be served. The court then stated, "[T]he only thing about that is, you choose to disagree with what the PSI reflects and I think that gives me the authority for the continuance." The court then decided to continue the hearing.

The sentencing hearing was continued to July 14, 1993. On July 14, 1993, the State filed an amended motion to impose the Habitual Criminal Act, citing the same aggravated assault conviction relied on in the earlier motion and additionally a conviction for "Robbery, on 9-21-76, in Gregg County, Texas."

The remainder of the sentencing hearing was eventually held on August 20, 1993. The defendant argued that to allow the State to establish another conviction for purposes of the HCA constituted double jeopardy because the defendant's liability under the HCA had been established at the prior hearing and the defendant had at that time understood what his liability under the HCA was. After reviewing the record of the earlier sentencing hearing, the court stated:

"I think we even had to say we weren't ready to proceed. The record does reflect that the defense did object to a continuance. I think the Court did rule that the Habitual Criminal motion would be allowed. I cannot say that I'm convinced that I limited it to the one because we were talking that we weren't ready to proceed with the sentencing. I can understand the defense's position, but I don't think that the Court had committed to the defendant that it would just be one conviction in regards to the Habitual Criminal Act. I certainly hadn't pronounced any sentence. I hadn't yet. We were close to it when the Court found out that he was, in all candorness, basically dumb as to the effect of the grid.

"So we'll proceed with sentencing. I'm going to allow the amendment since there's been no pronouncement and we'll proceed."

The State then established the defendant's robbery conviction as alleged in the amended motion to impose the HCA. The court ultimately imposed a sentence of 45 years to life based on two prior felonies.

Under the HCA, if the defendant is convicted of second-degree murder and has one prior conviction for a felony comparable to

those specified in article 34, 35, or 36 of chapter 21, the court may sentence the defendant to not less than the least nor more than twice the greatest minimum and maximum sentences authorized for second-degree murder. If the defendant has two such prior convictions, the court shall fix a minimum sentence of not less than the greatest nor more than three times the greatest minimum sentence and may fix a maximum sentence of not less than the least nor more than three times the greatest maximum sentence authorized for second-degree murder. K.S.A. 1994 Supp. 21-4504. For second-degree murder with one prior conviction, the minimum term is between 5 and 30 years and the maximum sentence is between 20 years and life, for a minimum sentence of 5 to 20 years and a maximum sentence of 30 years to life. For second-degree murder with two prior convictions, the minimum term is between 15 and 45 years and the maximum term is between 20 years and life, for a minimum sentence of 15 to 20 years and a maximum sentence of 45 years to life. See K.S.A. 1994 Supp. 21-4501(b). The defendant's sentence is the maximum which may be imposed for a third offender under the HCA, 45 years to life.

The defendant argues that the State should not benefit from the district court's continuance of the sentencing hearing to resolve the guidelines issues. He cites K.S.A. 1994 Supp. 21-4504(d), which states:

"If any portion of a sentence imposed . . . under this section, is determined to be invalid by any court because a prior felony conviction is itself invalid, upon resentencing the court may consider evidence of any other prior felony conviction that could have been utilized . . . under this section, at the time the original sentence was imposed, whether or not it was introduced at that time, except that if the defendant was originally sentenced as a second offender, the defendant shall not be resentenced as a third offender."

The defendant suggests that the continuance of the sentencing hearing occurred "under questionable circumstances" because of a matter unrelated to the HCA. The defendant reasons that the district court ruled at the first sentencing hearing that he would be sentenced as a second offender and the court therefore could not, at the subsequent hearing, sentence the defendant as a third offender.

The State argues that K.S.A. 1994 Supp. 21-4504(d) is inapplicable because the first imposition of the HCA was not reversed on appeal. The rationale behind the statute is that the defendant should not be penalized for having taken an appeal and that resentencing can have no basis in vindictiveness.

The defendant cites *State v. Zirkle*, 15 Kan. App. 2d 674, 814 P.2d 452 (1991). There, the district court sentenced the defendant to one to five years' imprisonment, then asked how much credit toward that sentence the defendant had. Upon the defendant's reply that he had approximately six months' credit, the court stated, " 'Well, I am going to vacate my sentence and make it two-to-five.' " 15 Kan. App. 2d at 675. Citing *State v. Moses*, 227 Kan. 400, 607 P.2d 477 (1980), the Court of Appeals held that the sentence was imposed when the court announced the one-to five-year sentence from the bench. "At that moment, Zirkle knew he had been sentenced and what the sentence was." 15 Kan. App. 2d at 677. The court stated: "Once a sentence is imposed, the district court is powerless to vacate that sentence and impose a harsher sentence." 15 Kan. App. 2d at 678. See *State v. Royse*, 252 Kan. 394, Syl. ¶ 2, 845 P.2d 44 (1992).

In *Royse*, on August 29, 1991, the district court imposed from the bench maximum sentences of 15 years to life on two counts of second-degree murder but failed to state whether the sentences were to run concurrently or consecutively. A week later, the district court ordered the defendant to return to court and ordered that the sentences run consecutively. 252 Kan. at 395. This court agreed with the defendant that his sentencing was complete when it was orally pronounced from the bench on August 29, which by operation of K.S.A. 1991 Supp. 21-4608(1) meant that the sentences shall be served concurrently and could not subsequently be increased. 252 Kan. at 396, 398.

In *Moses*, 227 Kan. 400, Syl. ¶ 2, this court stated: "The judgment in a criminal case, whether it imposes confinement, imposes a fine, grants probation, suspends the imposition of sentence, or imposes any combination of those alternatives, is effective upon its pronouncement from the bench."

The defendant argues that the court vacated a legal order under the HCA to impose an even harsher order. The State reasons that

the court had granted the State's motion to invoke the HCA but had not determined the number of prior convictions; rather, the court continued the sentencing hearing to determine the number of prior convictions.

The defendant also argues that double jeopardy precludes the State from having a second bite at the HCA apple. He reasons that he had a reasonable expectation as to his sentence which cannot be arbitrarily upset without offending the double jeopardy clause. The double jeopardy clause prohibits multiple punishments for the same offense. See *North Carolina v. Pearce*, 395 U.S. 711, 717, 23 L. Ed. 2d 656, 89 S. Ct. 2072 (1969); *State v. Freeman*, 236 Kan. 274, 281, 689 P.2d 885 (1984). The State contends that multiple punishments for the same offense were not imposed.

Although the record of sentencing here is somewhat confusing concerning whether the district court had ruled on the imposition of the HCA at the first sentencing hearing, it appears that the court did accept the State's proof that the defendant had one prior offense. A continuance was ordered not so the State could obtain additional proof of another prior conviction (the State rejected a continuance for that purpose), but to determine the defendant's prior criminal history for the purpose of calculating what his guidelines sentence would be. Significantly, though, the district court did not impose any sentence on the defendant at the first sentencing hearing. Had the court erroneously imposed sentence based on the two alleged convictions and been reversed because one of the alleged convictions was invalid, the trial court on remand could have allowed the State to introduce evidence of another conviction so long as the original sentence is not increased. K.S.A. 1994 Supp. 21-4504(d). Because sentence was not imposed, the defendant had no reasonable expectation as to what sentence would be imposed. When the sentencing hearing resumed, the State did provide proof of a second conviction. Under these circumstances, the trial court did not err in sentencing the defendant as a third offender.

## IV. ABUSE OF DISCRETION

The defendant next contends that the district court abused its

discretion in sentencing him to 45 years to life. He argues that the sentence was based on the district court's personal belief that the defendant was guilty of first-degree murder despite the jury's determination that he had committed second-degree murder. The defendant also asserts that the court failed to acknowledge the degree of provocation caused by the victim.

The district court has considerable discretion in determining the sentence to be imposed:

"It is the sentencing judge alone who determines the appropriate sentence or other disposition of the case. The sentencing judge determines the sentence by exercising his or her best judgment, common sense, and judicial discretion after considering all of the reports, the defendant's background, the facts of the case, and the public safety. A sentence imposed within the statutory guidelines will not be disturbed on appeal if it is within the trial court's discretion and not a result of partiality, prejudice, oppression, or corrupt motive." *State v. McDonald*, 250 Kan. 73, Syl. ¶ 4, 824 P.2d 941 (1992).

The sentencing judge's discretion "is not boundless and is to be exercised with regard to what is right and equitable under the circumstances." *State v. Bailey*, 251 Kan. 527, Syl. ¶ 3, 834 P.2d 1353 (1992).

The defendant points to comments made by the trial judge. The judge stated:

"I don't think the defendants specifically come to Kansas to kill anyone, but from his record I think he brought with him to Kansas propensity maybe to kill someone. What I'm referring to is his background. It's filled with violence. Both counsel in this case did a superb job in his trial. Mr. Greeno certainly did a superb trial because *if this had been a court decision, tried before a Court, this Court could have found first degree murder* for the reason there's no way in the world to believe that—the deceased other than the testimony of—the defendant itself gave any indication that he was armed. The defendant was parked across the street with another person. He walked over to the deceased. The deceased was attempting, according to two witnesses who were in the shop, to enter the door. The deceased wasn't even—I don't even know that he knew that the defendant was across the street in a car, but the defendant crossed clear across St. Francis to reach the defendant [*sic*]. And, of course, the Court does remember the testimony of the man [the apartment manager] on the porch with the deceased, but the Court also remembers that the defendant, according to the evidence, about asked or provoked whatever he received that day. The defendant had—at one point had the deceased coming out of a closet and hiding. The evidence by that same individual who spoke on the porch, if I have my

witnesses straight, testified that it occurred in the hallway. That gun was gone back to the pawnshop and gotten for some reason with it having been returned, and it could be looked upon as having satisfied the landlord that the defendant decided that he was going to go back and get the gun for some purpose. I can't say what he had in mind. I know what he used it for. *I have no disagreement with the decision that the jury brought in, even though I would have found first-degree murder if I'd have heard it. But here—here it is expected to respond to, in their decision making process, the same way that a Court might, and that's one of the strong points for the jury system.* There's no question that the community, whatever community Mr. Hunt wishes to live in, they'd be better off with him out of it, therefore, the primary concern of this Court in connection with 4601 is the community.

"We've covered and I've been reminded of the defendant's prior criminal history and one of violence essentially. The defendant, in this Court's mind, has had all kind of breaks through different judicial areas or places where other judicial discretion was exercised. I don't know any greater harm that could be caused than a person to be killed, whether it's first or second degree. Certainly the defendant intended—when you shoot someone you certainly intend to cause whatever the bullet results in the end of it of the occasion. *I don't think that the law allows provocation to extend over to the time that—the time that passed after Mr. Hunt provoked the defendant [sic] into whipping him in the head—across the head with the iron. The Court's basing provocation on the evidence and what happened in the hallway, what happened down—. . .—and on some steps somewhere. I don't cite it 'cause I don't remember exactly, but the record will show. I stated before on the day in question there was certainly no part or action taken by the deceased in regards to the defendant.*

*"There's no justification whatsoever for the criminal contact—conduct, I should say, not contact. The day in question, the criminal conduct was all that of the defendant, as I've said before, none on the part of the deceased."* (Emphasis added.)

The defendant argues that the court's remarks that it would have found first-degree murder are irrational and undermine the jury system. He states that he "can reasonably assume that he received [a sentence of 45 years to life] because the judge disagreed with the jury's verdict. . . . If this sentence is not vacated, he will rightfully believe that he was hammered because the judge disagreed with the verdict." The defendant also contends that the court failed to consider mitigating factors relating to the factors found at K.S.A. 21-4606(2)(d), (e), and (f):

"(d) The degree of the defendant's provocation;

"(e) Whether there were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense;

"(f) Whether the victim of the defendant's criminal conduct induced or facilitated its commission."

He reasons that the court confused mitigation of punishment and guilt.

The State points out that the court specifically stated that it had no disagreement with the jury's verdict and reasons that it was not erroneous for the court to note the jury could have reached a different verdict based on the evidence. The State also argues that Martin's actions a week before the shooting do not constitute provocation, there was no justification for the defendant's action, and Martin did not induce or facilitate his murder. The State reasons that the earlier beating was not a mitigating circumstance. The State also points to other factors which support the sentence imposed, including the defendant's prior criminal history.

The court's comments in totality reflect proper sentencing considerations. The court's comments properly evaluated the sentencing factors enumerated in K.S.A. 21-4606(2). It is for the sentencing court to determine what weight to give to mitigating factors. The court did consider the fact that the defendant and Martin had a prior altercation in which Martin beat the defendant with an iron. The court noted that the iron incident was a week before the shooting, and the court gave little weight to the iron incident because of this fact. The court amply justified the sentence imposed, and we are unable to say that it was an abuse of discretion.

## V. ALLOCUTION

Finally, the defendant contends that he was denied allocution at sentencing. K.S.A. 1994 Supp. 22-3424(4) states in pertinent part: "Before imposing sentence the court shall: . . . (d) address the defendant personally and ask the defendant if the defendant wishes to make a statement on the defendant's own behalf and to present any evidence in mitigation of punishment."

Before sentencing the defendant, the court twice addressed him. The court first stated, "I'll ask Mr. Hunt if there's anything he'd want to say in regards to this, his case, that he'd want to say

at this time. This is the time that he may speak on his own behalf about this case." The defendant responded: "Judge Watson, I didn't come to Kansas to kill anyone. That wasn't my intent. I didn't come to Kansas to get robbed and beat up. Thank you." After the lengthy comments of the court cited in the previous section of this opinion, the court stated: "I would ask defense counsel or—and the defendant if there's any legal reason why the Court should not impose sentence at this time." The response was by defense counsel: "None that we know of, Your Honor."

The defendant contends that the right to allocution may not be waived by either argument of counsel or by silence of the defendant. The defendant cites *State v. Webb*, 242 Kan. 519, 748 P.2d 875 (1988). There, the sentencing court asked for and received defense counsel's comments on sentencing. The court did not specifically address the defendant but asked a general question, "I would ask, is there any legal reason why sentence should not be imposed?" Defense counsel responded that there was not, but the defendant was silent. 242 Kan. at 520. After a thorough discussion of the history of allocution and the rationale behind it, this court stated: "We hold the provision in K.S.A. 22-3424(4) establishes the right of a defendant to allocution, which right is not waived by the defendant's silence or by argument of counsel." 242 Kan. at 529.

The court here did permit the defendant to make a statement on his own behalf prior to sentencing, but the court did not tell the defendant that he could present evidence in mitigation of punishment. The failure to ask the defendant if he wished to present any evidence in mitigation of punishment did not comply with K.S.A. 1994 Supp. 22-3424(4)(d). The defendant was denied allocution.

The defendant states, "The denial of allocution was a prejudicial violation of Mr. Hunt's right to be heard during his sentencing hearing." He does not otherwise show how the failure was prejudicial.

The State cites *State v. Borders*, 255 Kan. 871, 879 P.2d 620 (1994). There, the sentencing was originally scheduled for 2:30 p.m. but was rescheduled for 10:30 a.m. At the morning hearing,

the defendant's counsel sought a continuance and informed the court that he had been unable to notify the defendant's family of the morning hearing and therefore they were unable to be present. The court denied the continuance. 255 Kan. at 874. Before sentencing the defendant, the court gave the defendant the opportunity to make a statement " 'in the way of what the Court sentence might or should be.' " 255 Kan. at 876. The defendant declined to make a statement. On appeal, the defendant argued that the denial of a continuance precluded him from presenting evidence in mitigation of punishment, but he did not show what the evidence might have been. This court stated:

"We believe the requirement of a showing of prejudice to the substantial rights of the defendant is equally applicable to alleged violations of the allocution statute as it is to the many other areas of criminal procedure where prejudice must be shown to justify a reversal. The defendant here has shown absolutely no prejudice, and while failure to comply with a mandatory statute, such as K.S.A. 1992 Supp. 22-3424(4), is error, [it is] not reversible error unless prejudice to the substantial rights of the defendant is shown." 255 Kan. at 881.

In the syllabus this court stated:

"For a defendant to successfully assert error based upon a denial of the opportunity to present evidence in mitigation of punishment pursuant to the right to allocution in K.S.A. 1992 Supp. 22-3424(4), the defendant must make a proffer of the contemplated evidence comparable to that required by K.S.A. 60-405." 255 Kan. 871, Syl. ¶ 4.

Here, the defendant does not identify how he was prejudiced by the sentencing court's failure to ask if he wished to present evidence in mitigation of punishment. The defendant has not made the requisite proffer of the contemplated evidence, nor does the record show that his substantial rights were prejudiced. We do not find that the defendant was prejudiced by the court's failure to provide allocution. The denial of allocution was harmless error.

Affirmed.