No. 70,715

STATE OF KANSAS, *Appellee*, v. SCOTTY R. ADAM, *Appellant.*

(896 P.2d 1022)

Opinion filed June 2, 1995.

*Debra J. Wilson*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Steven L. Opat*, special prosecutor, argued the cause, and *Robert L. Daub*, county attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Scotty Adam appeals from his jury convictions of second-degree murder and aggravated robbery. He was sentenced to concurrent terms of 15 years to life and 5 to 20 years' imprisonment.

Adam raises several issues on appeal. He claims error concerning the non-pattern instruction on aggravated robbery, the instruction on the accused's initially provoking the use of force by the deceased, and the instructions on voluntary and involuntary manslaughter. He also claims error in admitting gruesome photographs into evidence and in the State's suppression of exculpatory evidence.

The events leading to this tragedy started shortly after midnight on January 23, 1993. Scott Miller, Dustin Rothfuss, and Scott Sanders stopped in Council Grove to buy gasoline at a convenience store. They were driving back from Emporia to Junction City, where they lived. They had been drinking on the road and for several hours in a bar in Emporia.

They were in Sanders' car, and he was driving. Larry Shane and Andy Helton were sitting in a booth inside the convenience store; they laughed at Miller when he went in. Miller, who admitted being drunk, pulled a toothpick from the mouth of one of them. Then Sanders came in and, without exchanging words or getting involved with either of the young men in the booth, left with Miller. The convenience store clerk called the police.

As Sanders pulled out of the convenience store lot, a white Camaro followed. The Camaro was being driven by Scotty Adam. Adam and J.B. Pritchard, both from Council Grove, had been ".cruising." They had pulled in near the gasoline pumps to watch because they had seen Miller and Sanders and thought they looked like they might start a fight. When Miller and Sanders ran out of the convenience store "yelling and stuff," Adam and Pritchard decided to chase them out of town.

After getting out on the highway, Adam and Sanders tried to run each other off the road. Adam passed Sanders. Then Sanders passed Adam. Adam started to pass Sanders again, and Sanders moved his car to the left so that Adam went off the road on the left. Adam accelerated to get around Sanders. In a short time, one

of the young men who had been inside the convenience store drove his truck alongside Adam's Camaro and began slowing down. Adam slowed, too. When they stopped side by side, Sanders stopped behind them. They were approximately three miles north of Council Grove.

Adam testified that he anticipated a fight and stopped to watch it, but he did not want to be involved in it because he had observed at the convenience store that Miller and Sanders were big. Adam is 5'6" tall and at that time weighed 128 pounds. Sanders was 6'3" tall and weighed 200 pounds.

Sanders was angry, according to Miller, because Adam had swerved close to his car and Sanders was very protective of his car. Miller testified that others opened their doors first, but Sanders was the first person to emerge from a vehicle. On direct examination, Miller testified that, as Sanders got out of his car, he said to no one in particular, "Do you want some?" On cross-examination, he testified that Sanders jumped out of his car, ran up to the driver's side of the Camaro, and yelled, "[Y]ou want some?" Miller saw Sanders hit Adam.

Pritchard testified that Sanders opened the driver's door of the Camaro, said, "You want a piece of me?" and pulled Adam partway out of the car. Sanders had Adam up against the car door. Pritchard testified that Adam was "thrashing around out there."

Adam testified that he likes knives and kept one in an unsnapped scabbard on the console in his car. As Sanders pulled Adam from the car, Adam grabbed his knife. Adam testified that Sanders repeatedly hit him. Adam hit Sanders in the back with the butt of the knife; Sanders hit Adam once more and caused him to slump down. It was then, according to Adam, that he "just started swinging" his knife and stabbed Sanders. Adam testified that he had no intention of using the blade. Sanders collapsed, bleeding from the chest.

Miller lay Sanders on the ground, and then Shane started hitting Miller. Adam testified that he was in shock. When he looked down and saw the knife in his hand, he just threw it away.

Adam testified that he walked over to where Sanders was lying and moved Sanders' head to see if he was moving or awake. Before

trial, Pritchard made the statement to a law enforcement officer that Adam had kicked Sanders in the head as he walked by. At trial, Pritchard testified that Adam "just kind of scooted" Sanders' head or shoulder as he walked by.

As Adam walked back to his car, he picked a cap up off the ground and threw it into the car. Adam testified that he did not know that the cap belonged to Sanders; in fact, he was not even aware of what it was.

Realizing that Sanders was down, the young men from Council Grove got back in their vehicles and drove away. At the double shelters on the lake, they stopped and got out of their vehicles. Adam testified that by then he realized that what he had tossed in his car was a cap and that it did not belong to him or his friends. Helton suggested that he burn the cap. Shane gave him a lighter, and Adam set it on fire.

By shortly after 1:00 a.m., a law enforcement officer and an ambulance had been dispatched to the scene of the stabbing. Sanders was not breathing and had no pulse upon arrival at the emergency room of the hospital, and efforts to resuscitate him were not successful. He had four stab wounds—in the left side of his chest, the upper right side of the abdomen, in the lower part of the left abdomen, and on the left shoulder. An autopsy was performed, and the pathologist testified that the cause of death was internal bleeding caused by the stab wound to the chest. She stated that Sanders would have lost consciousness within a few seconds of being stabbed in the chest.

At 1:39 a.m., Adam walked into the sheriff's office and said, "I'm the one that stabbed that guy." In response to the sheriff's question about what happened, Adam said, "I wasn't getting my ass kicked."

About mid-morning of January 25, Adam was examined by Dr. Lora Siegle at the request of law enforcement officers with regard to his complaint of pain in his left side. She found a small bruise on his left side. She found no other bruises, no bumps on his head, no abrasions, and no loose teeth. In a post-trial motion, it came out that a deputy sheriff had examined Adam on January 24 and reported finding a bump on Adam's forehead which extended up into his hairline.

We first consider Adam's claim that the non-pattern instruction on aggravated robbery was improper. Adam was charged with willfully taking a red baseball cap from the presence of Scott Sanders by force. The district court gave two jury instructions on aggravated robbery. The first was the pattern instruction, PIK Crim. 3d 56.31:

"The defendant is charged with the crime of aggravated robbery. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. That the defendant intentionally took property from the person or presence of Scott O. Sanders;

2. That the taking was by force;

3. That the defendant inflicted bodily harm on any person in the course of such conduct; and

4. That this act occurred on or about the 23rd day of January, 1993, in Morris County, Kansas."

The second instruction, which is the subject of this issue, stated:

"Under circumstances where a defendant causes bodily harm to a person which results in the death of such person, and the defendant later takes property from the 'person' or 'presence' of the deceased and where the act of force and the taking of the property are so connected as to form a continuous chain of events so that the prior force makes it possible for the defendant to take property from the person or presence of the deceased, without resistance, such is sufficient to constitute the offense of Robbery or Aggravated Robbery."

It was requested by the State, and defense counsel strenuously argued against its being given to the jury.

The State contends that this court should not reverse Adam's aggravated robbery conviction due to the district court's adding the non-pattern instruction unless it is clearly erroneous. Defense counsel, however, interposed a timely and specific objection to the instruction. The appropriate standard for appellate review, therefore, is as follows:

"When reviewing challenges to jury instructions, the instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous." *State v. Johnson*, 255 Kan. 252, Syl. ¶ 4, 874 P.2d 623 (1994).

It is Adam's contention that the non-pattern instruction does not properly state the law as applied to the facts. It is the State's position that the jury could not reasonably have been misled by the non-pattern instruction if it had read the instruction, as it must be read, in conjunction with the pattern instruction on aggravated robbery.

In *State v. Myers*, 230 Kan. 697, Syl. ¶ 2, 640 P.2d 1245 (1982), the court decided that a conviction of robbery may be sustained by proof that *prior* force made it possible for the defendant to take property from the victim's body. Myers shot his victim and three hours later returned to the scene of the killing for the stated purpose of making sure he was dead. Saying that he was going to remove " 'identification and stuff' " from the body, Myers took the victim's wallet, keys, and a black notebook. 230 Kan. at 698. Myers put the money from the wallet into his own pocket, tore up the wallet and notebook, and threw them away. In reaching its holding, the court rejected Myers' contention that the crime of robbery requires the threat or force to be concurrent with the taking of the property. The court also rejected the contention that the force must be used with intent to steal. In this regard, the court stated:

"[W]here a defendant shoots his victim and later decides to take and remove the victim's personal belongings, where the act of force and the taking of the property are so connected as to form a continuous chain of events so that the prior force makes it possible for the defendant to take the property from the victim's body without resistance, that is sufficient for a conviction of the crime of robbery under K.S.A. 21-3426. Since the killing was accomplished with a dangerous weapon, a violation under K.S.A. 21-3427 was established by the evidence." 230 Kan. at 703-04.

In the present case, the State proposed giving the non-pattern instruction in addition to the pattern instruction for the elements of aggravated robbery. The district judge agreed to include the proposed instruction because he believed that it was "necessary for the jury's understanding." It is not mandatory for courts of this state to use PIK instructions, but this court strongly recommends it:

"The pattern jury instructions for Kansas (PIK) have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury in-

structions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed." *Johnson*, 255 Kan. 252, Syl. ¶ 3.

The non-pattern instruction in the present case was referred to by the parties and the district court as being derived from *Myers*. Defense counsel objected that the element of intent had been eliminated in the State's rephrasing of the *Myers* rule. A comparison of the court's statement in *Myers* with the jury instruction here shows that the words "decides to" were left out of the instruction. Thus, Adam contends, the jury could find him guilty of aggravated robbery without finding that he intended to take the cap. We agree.

Defendant's defense theory was that he never formed any intent to take the victim's cap and that he picked it up reflexively. It was not the State's contention nor is there any evidence which tends to show that Adam killed Sanders in order to take his cap or with the thought that he would be able to take it if Sanders were unable to resist. Adam's testimony was that he was in shock when he realized he had stabbed Sanders in or near the heart and saw him lying on the ground bleeding. Adam testified that he moved Sanders' head with his foot to see if he would respond, and then on his way back to his car Adam picked up Sanders' cap. Before turning himself in to law enforcement authorities, Adam set fire to the cap at the suggestion of one of the other young men.

The State's position is that the jury could not have found Adam guilty of aggravated robbery without finding that he intended to take the cap because the pattern instruction stated that it must be proved that Adam "intentionally took property from the person or presence of Scott O. Sanders." The State reiterates that the non-pattern instruction is not to be read in isolation. What the State does not furnish, however, is a single reference to evidence which might tend to show that Adam's picking up the cap was anything other than an automatic response to seeing it lying on the ground.

Thus, the evidence which has been brought to the court's attention does not support a finding that Adam intentionally took the cap.

In the circumstances of this case, where the defendant admitted stabbing Sanders and admitted taking the cap but asserted that he took it reflexively while in shock, intent was the only question which the jury had to decide with regard to the charge of aggravated robbery. The district court added the non-pattern instruction in the belief that application of the PIK elements instruction to the facts of this case required further explanation. The non-pattern instruction advised the jury that the force did not need to be concurrent with the taking, but it contained no mention of intent. Omission of the critical element of intent in these circumstances is more than a mere lack of guidance on the issue. The omission of intent from the explanatory supplement could have misled reasonable jurors to believe that Adam's picking up the cap after stabbing Sanders in and of itself constituted the offense of aggravated robbery. The specific defect and the possibility of misleading the jury were raised by defense counsel during the instruction conference when the district court judge could have remedied the problem. In summary, the non-pattern instruction did not properly and fairly state the law as applied to the facts in this case, and its potential for misleading reasonable jurors was not substantially diminished by its association with the pattern instruction on aggravated robbery. We agree that the instruction should not be read in isolation; however, the confusion results when the two instructions are read together. We find merit in Adam's contention that the jury could have found him guilty of aggravated robbery without finding that he had the intent to take the cap from Sanders' presence. The district court committed reversible error in giving the additional instruction on aggravated robbery.

We next consider if the instruction on the accused's initially provoking the use of force by the deceased was supported by the evidence. Adam and Sanders were driving separate vehicles as they left Council Grove. There was evidence that they tried to run each other off the road. The young man who was riding with Sanders testified that Sanders was angry when he stopped his car and got out. He testified that Sanders was angry because "they swerved

close to his car, and he was real protective of his car; he didn't want anything to happen to it."

Based on this evidence, the State requested an instruction on the accused's initially provoking the use of force by the deceased. Defense counsel objected on the ground that there was no evidence that Adam provoked any use of force against himself. Defense counsel argued that the evidence, at most, established erratic driving, which he likened to words and gestures, which do not amount to provocation. The State responded that Adam's driving was conduct, not mere words or gestures. The district judge stated:

"I believe this is a very close question with regard to the issue of provoked use of force. However, having determined that I should instruct on self-defense, I feel this instruction should be given in the light of this and the defendant's theory on involuntary manslaughter due to unlawful excessive force.

"The state's theory of provocation may be somewhat unique, but in light of the evidence presented here and the theories being presented, I think the instruction is appropriate."

Accordingly, the district court gave the following instruction, which is based on PIK Crim. 3d 54.22:

"A person who initially provokes the use of force against himself is not justified in the use of force to defend himself unless:

He has reasonable ground to believe that he is in present danger of death or great bodily harm, and he has used every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the other person."

There is no contention that the provocation instruction incorrectly states the law. The only contention is that it is not supported by the evidence.

Under K.S.A. 21-3214, the defense of self-defense, which is described in K.S.A. 21-3211, is not available for a defendant who initially provoked the use of force against himself. K.S.A. 21-3211 provides: "A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself . . . against such aggressor's imminent use of unlawful force." K.S.A. 21-3214 provides in pertinent part:

"The justification described in sections 21-3211 . . . is not available to a person who:

. . . .

"(3) Otherwise initially provokes the use of force against himself or another, unless:

(a) He has reasonable ground to believe that he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant."

In the circumstances of this case, if the jury had not been instructed on initial provocation by the accused, Adam's self-defense theory could have been established by a showing that he reasonably believed that force was necessary to defend against Sanders' use of force. With the jury instructed as it was, however, it may have concluded that Adam initially provoked the use of force against himself. If so, establishment of his self-defense theory required a showing not only that he reasonably believed that he was in imminent danger of death or great bodily harm but also that he had exhausted all reasonable means to escape.

The State cites *State v. Beard*, 220 Kan. 580, 552 P.2d 900 (1976). In *Beard*, this court approved the trial court's giving an instruction on the accused's initially provoking the use of force. We stated: "Whether defendant was an aggressor remained a question for the jury. There was ample evidence in this case which would have justified the jury in finding that defendant was an aggressor." 220 Kan. at 582.

In *State v. Hartfield*, 245 Kan. 431, 781 P.2d 1050 (1989), Hartfield complained of the trial court's giving instructions on the accused's initially provoking the use of force. The court merely states that the instructions "do not provide grounds for reversal" and refers to *Beard*. 245 Kan. at 445.

Adam contends that his rights were prejudiced because the instruction on initial provocation misled the jurors into believing that his conduct amounted to provocation and, as a consequence, his theory of self-defense was "substantially undercut." Adam overstates his case in assuming that the jurors determined that his conduct amounted to provocation, but he correctly points out that they could have made that determination. Because the legal effect of

the accused's initially provoking the use of force is to raise the threshold of proof for self-defense, a finding by the jury that the defendant initially provoked the use of force diminishes the likelihood that it will find that defendant's conduct was justified as self-defense. In *State v. Hunt*, 257 Kan. 388, 894 P.2d 178 (1995), the district court gave initial aggressor instructions consistent with PIK Crim. 3d 54.21 and PIK Crim. 3d 54.22. The defendant objected to giving the instructions. In finding there was no error, we said:

> "Instructions 10 and 11 are correct statements of the law. The jury was not instructed that the defendant was an initial aggressor or that the defendant had provoked Martin into reaching for what the defendant thought was a gun. As in *Beard*, the question of whether the defendant was an aggressor was one for the jury. If the jury did not find that the defendant was an aggressor, it could disregard the limit on the defendant's right to use self-defense. Instructions 10 and 11 were not misleading or so confusing that the district court erred in giving them. We do not find error on this issue." 257 Kan. at 394.

*Beard* and *Hunt* are controlling in the present case. Although the evidence was not ample, it was sufficient to justify a finding by the jury that Adam was an aggressor. We note, in addition, two instruction matters which need to be addressed in the event this matter is retried. First, the district court failed to give PIK Crim. 3d 52.08, which the Notes on Use advise "should be given in connection with the instruction defining" self-defense. That instruction states:

> "The defendant claims as a defense that (*here describe the defense claimed*). Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant. If the defense asserted causes you to have a reasonable doubt as to the defendant's guilt, you must find the defendant not guilty."

Without this instruction, the jury had little or no guidance in understanding how a finding of self-defense should affect its consideration of the evidence. Where, as here, the jury was given two possible standards against which to measure the evidence of self-defense (PIK Crim. 3d 54.17 and 54.22, self-defense with and without the accused's initially provoking the use of force), the need was particularly acute for instruction on how to consider the evidence.

Second, there is a typographical error in the self-defense instruction, which would not have been apparent to the jury as an error, because the sentence parses as is. As given, the instruction states in pertinent part: "A person is justified in the use of force against an aggressor when and to the extent it appears to him [and] he reasonably believes that such conduct is necessary to defend himself against such aggressor's imminent use of unlawful force." (Bracketed material added.) The effect of the omitted "and" probably would not have acted to the defendant's detriment, except insofar as it muddied the already murky waters.

We next consider if the instructions on voluntary and involuntary manslaughter were correct. Adam contends that the trial court incorrectly instructed the jury on voluntary and involuntary manslaughter. The instructions given on these two offenses were identical to the instructions requested by defense counsel. This court has stated its rule as follows: "When a defendant requests that an instruction be given at trial and such instruction is given, he or she cannot on appeal claim it was error to give the instruction." *State v. Sutton*, 256 Kan. 913, Syl. ¶ 5, 889 P.2d 755 (1995). Moreover, because Adam was convicted of second-degree murder, any error in the manslaughter instructions would be harmless.

Next, Adam argues that he is entitled to a new trial due to the State's suppression of exculpatory evidence. He complains that during the discovery period, the prosecutor did not furnish to his counsel the narrative report of Deputy Ron Leeson of the Morris County Sheriff's Department. The report states in full:

"On 012493, at approximately 7:00 PM, I took four photographs of Scotty Adam to check for possible scratches, bruises and abrasions on his head, shoulders and neck. I took one front facial and neck, 1 right side head neck & shoulders, 1 back of head, neck and shoulders and 1 left side head, neck and shoulders.

"At this time I did not observe any of the above. I also asked Scotty Adam if he had any scratches, bruises or abrasions anywhere else on him. He replied no but he did have a bump on his forehead. Scotty showed it to me. Part of it was · on his forehead and the rest of it was above the hairline on his head.

"The photographs were sent in to be developed. When they came back the photographs were all printed on one exposure frame, malfunction of the 35 mm camera. As a result I have no photographs of Scotty Adam's head, neck and shoulders.

"This is all the information I have at this time."

The report was the subject of a post-trial motion by Adam. He argued then, as he does on appeal, that the report is exculpatory and that it should have been furnished to defense counsel in any event and in particular in response to defense counsel's discovery request for statements made to law enforcement officers and all material or information which might tend to negate Adam's guilt. The State responded that it followed an open file policy so that the report was at all times available to defense counsel and that the report was not relevant because there is no reasonable probability that its disclosure to the defense would have affected the outcome of the trial. The district court noted that bad faith was not alleged, questioned whether defense counsel had exercised due diligence, found that the report was not material, and concluded that the report would not have affected the verdict.

In its analysis of instances of prosecutors' failing to furnish evidence to defense counsel, this court has described three classifications ranging from deliberate bad faith suppression in order to obstruct the defense to what has been dubbed the "oversight" classification. *State v. Nguyen*, 251 Kan. 69, 81-82, 833 P.2d 937 (1992). Adam concedes that an "oversight" matter is at issue here. The standard to be applied by the court is as follows:

"If the suppression of evidence is an oversight, as here, a defendant is granted a new trial only if the record establishes '(1) that evidence is withheld or suppressed by the prosecution, (2) that the evidence withheld was clearly exculpatory, and (3) that the exculpatory evidence withheld was so material that the withholding of the same from the jury was clearly prejudicial. [Citation omitted.]' *Pearson*, 234 Kan. at 916." 251 Kan. at 82.

Adam contends that the evidence was clearly exculpatory and material because it supported his self-defense theory by corroborating his testimony about Sanders' hitting him and contradicted the testimony of the State's rebuttal witness, Dr. Siegle. Adam testified that Sanders pulled him out of his car and "was hitting, hitting and hitting me." When Adam hit Sanders in the back with the butt of his knife, Sanders hit Adam once more and caused him to slump down. It was then, according to Adam, that he "just

started swinging" his knife and stabbed Sanders. In rebuttal, the State called the doctor who examined Adam on January 25, 1993. Adam told her he had been hit in the left side and on the head. She found a small contusion on his left side, but her examination revealed no abnormalities on his head. Dr. Siegle testified that bumps, bruises, or abrasions suffered by Adam in a fight on the morning of January 23 probably would have been seen by her during the examination on January 25. Deputy Leeson's report established that on January 24, Adam had a bump on his forehead which extended into his hairline. Thus, it tends to disprove the inference, which may be drawn from Dr. Siegle's testimony, that Adam had not been pummeled by Sanders' blows. Adam's argument is that the omitted report creates a reasonable doubt which otherwise did not exist by lending credence to his self-defense theory. He seems to believe that there is particular significance in the omitted report's contradicting the State's own rebuttal witness.

The State counters that nondisclosure of the report was "due in some part to the failure of the defendant's counsel to pursue the available open file discovery policy." In addition, according to the State, the report was neither exculpatory nor material in that there is no reasonable likelihood that it would produce a different result upon retrial. We do not agree.

There can be no question that the nondisclosure of Deputy Leeson's report was of major significance. The report corroborated Adam's claim of self-defense and contradicted the testimony of the State's rebuttal witness, Dr. Siegle. Further, the significance of the nondisclosure was compounded by the following remarks of the State's attorney in closing argument:

"He tells us that Scott Sanders, the victim, kept hitting him, punching him repeatedly, pummeling him, if you will, within a time frame, when you put it together, that the other witnesses describe as being mere seconds. Scott Sanders is over six foot tall, two hundred and twenty some pounds. The defendant, much smaller, he's being pummeled, he's being hit repeatedly about the head, the face.

"Yet, Dr. Lora Siegle, who was called on rebuttal, who, in fact, examined Mr. Adam, doesn't seem to indicate that perhaps that happened. If you believe the testimony of Dr. Siegle, there seems to be no evidence to support the defendant's claims. She testified that she observed none of the injuries that one would nor-

mally associate with such a beating inflicted on a person of the defendant's size by a person of the victim's size.

"Is the defendant's testimony credible? You have to use your common sense. You must do this in evaluating both the state's evidence, the claims of the state, and the claims of the defendant."

Deputy Leeson's report is exculpatory and material. For that reason, the State had an affirmative duty to disclose the evidence. See *Nguyen*, 251 Kan. 69, Syl. ¶ 7. The State has cited no authority, nor are we aware of any, which indicates that its positive duty is discharged by an "open file policy." The State's failure to carry out its duty and its comments to the jury in closing argument were error. The aggregate effect was to seriously prejudice Adam in establishing his defense. Thus, we conclude the defendant's conviction of second-degree murder must be reversed.

Adam also argues that gruesome photographs should not have been admitted into evidence. State's Exhibits 7F and 7G were admitted into evidence over the objection of defense counsel. They are photographs taken during the autopsy of Sanders' body and introduced during the testimony of the pathologist. She made it clear that death was due to internal bleeding resulting from a stab wound to the heart. There was no dispute about the cause of death. With regard to photographs of this kind, the court has stated: "When dealing with pictures of an autopsy, great care must be taken so that the pictures do not simply shock and revolt, but rather help the jury understand the medical testimony." *Hartfield*, 245 Kan. 431, Syl. ¶ 9.

Exhibit 7F shows the stab wound in the sac around the heart. Exhibit 7G, according to the testimony, "shows the cutting wound or the stab wound penetrating the aorta, just above the aortic valve." None of those features is apparent in Exhibit 7G. They were not pointed out during the pathologist's testimony. The State contends that

"[b]oth photographs were offered to demonstrate not only the violent nature of the wounds inflicted upon the victim, but also the manner of his death, and both exhibits illustrate the depth of the wounds, thus showing to the jury the significant force with which the wounds were inflicted and the degree of trauma suffered by the victim."

A photograph of a probe inserted into the chest wound might have shown how deep it was and by inference how much force was used to create it, but the autopsy photographs do not illustrate these points.

Both photographs are extremely gruesome and repulsive. Neither of these photographs shows the two puncture wounds to the abdomen. The photographs marked Exhibits 7B, 7D, and 7E show the two wounds to the abdomen, and those exhibits are not at issue in this appeal. The probative value of Exhibit 7F is minimal. There seems to be no probative value to Exhibit 7G. In the latter photograph, the heart has been pulled out of the chest cavity and cut open to show a cross-section. These photographs are strikingly similar to ones disapproved by the court in *State v. Boyd*, 216 Kan. 373, 532 P.2d 1064 (1975). There, Justice Prager wrote for the court:

"We believe, however, that exhibit 39 was so gruesome and repulsive that the trial court abused its discretion in admitting that exhibit into evidence. In our opinion the offer of this exhibit could be but for a single purpose—to inflame the minds of the members of the jury. This court has gone a long way, perhaps too far, in countenancing the introduction of grisly, gruesome photographs. *Here exhibit 39 shows the body of the deceased cut open from chin to groin and laid out like a disemboweled beef in a packing plant. A flap of chest skin partially covers the deceased's face and the chest and abdominal organs of the deceased are presented in full view.* In this case the cause of death of the victim was really not in dispute. The state's medical expert made it clear that death was due to internal bleeding resulting from stab wounds." (Emphasis added.) 216 Kan. at 377-78.

Here, as in *Boyd*, the trial court abused its discretion in admitting the photographs into evidence, and, absent a change in circumstances on retrial, Exhibits 7F and 7G should not be admitted into evidence.

The judgment of the district court is reversed, and the case is remanded for a new trial.

ABBOTT, J., dissenting: I dissent from that part of the majority opinion holding the trial court erred in admitting autopsy photographs into evidence and granting a new trial on the basis that the State suppressed exculpatory evidence.

I also dissent from the majority's holding that "the evidence which has been brought to the court's attention does not support a finding that Adam intentionally took the cap." Even the most serious offense can be proven by circumstantial evidence. The evidence in this case is sufficient to support a jury verdict of guilty of aggravated robbery. I agree with the majority that the instruction is reversible error because it omits the question of intent.

As to the autopsy pictures, they are no more gruesome than other autopsy pictures and, in fact, are less gruesome than most. We have held it was not error to introduce autopsy pictures in literally hundreds of cases. Only once has this court held it was error, and that case is cited by the majority. Although that case has been cited to this court countless times, it has never been followed. This same date we are affirming a case on this issue where the autopsy picture was every bit as gruesome and also included a view of the victim's head (which is not in the pictures before us). *State v. Arteaga*, 257 Kan. 874, 896 P.2d 1035 (1995).

I ask of the majority, is an autopsy photograph admissible in evidence or not? If not, let us tell the prosecutors and not leave them guessing and forced to risk retrying a case. No valid distinction can be drawn between a case reversed because autopsy pictures were introduced and one in which a guilty verdict is affirmed where autopsy pictures even more gruesome were introduced. Prosecutors will also be confused by the majority holding that the photos cannot be used on retrial. They may become even more relevant on retrial depending on the evidence presented. At a minimum, the trial court should be given discretion on retrial.

Here the autopsy pictures show the force and number of wounds. It demonstrates that while the victim was alive, he was disemboweled and his heart was severed from its main artery. While the autopsy picture is gruesome, so was the manner of the victim's death.

I would hold that the trial court did not err in admitting the autopsy pictures into evidence.

I would also affirm the second-degree murder conviction. I stress that the defendant bears the burden of showing reversible

error. Here, the defendant, in my opinion, fails to meet that burden.

It is important to keep in mind what this case is about. This is not a newly-discovered evidence case. The majority recognizes this. This, the majority holds, is a case where the prosecution suppressed evidence by not disclosing it to the defendant and the failure to disclose prejudiced the defendant. I disagree on both points.

This is not a situation where knowledge of the existence of exculpatory evidence or possible leads thereto was withheld by the prosecution. The defendant told the deputy about the lump on his head and was obviously aware the deputy had photographed his head. The majority penalizes the prosecution for the "suppression" of evidence of which the defendant already had knowledge. Defendant and his counsel knew of the lump and its importance to the defense. Testimony was introduced by the defense at trial concerning the lump. The defendant so testified as did one of his witnesses, both describing the lump in their testimony.

The defendant also knew the deputy had photographed his head, and he had told the deputy about the lump. The prosecutor had an open file policy, and a report in the prosecutor's file reads as follows:

"On 012493, at approximately 7:00 PM, I took four photographs of Scotty Adam to check for possible scratches, bruises and abrasions on his head, shoulders and neck. I took one front facial and neck, 1 right side head neck & shoulders, 1 back of head, neck and shoulders and 1 left side head, neck and shoulders.

"At this time I did not observe any of the above. I also asked Scotty Adam if he had any scratches, bruises or abrasions anywhere else on him. He replied no but he did have a bump on his forehead. Scotty showed it to me. Part of it was on his forehead and the rest of it was above the hairline on his head.

"The photographs were sent in to be developed. When they came back the photographs were all printed on one exposure frame, malfunction of the 35 mm camera. As a result I have no photographs of Scotty Adam's head, neck and shoulders.

"This is all the information I have at this time." (Underlining supplied.)

The following morning, the defendant was taken to a medical doctor for the express purpose of checking the defendant's head for any signs of bumps, bruises, scratches, or abrasions. The doctor testified that the defendant told her he had been "hit on the head."

She testified she found no bumps, bruises, abrasions, or loose teeth. The doctor did find a contusion above the left hip that measured one-half by one centimeter.

Any lump the defendant had on his forehead that was observed by the deputy was so small that a medical doctor who was specifically looking for it could not find any evidence of it 17 hours after the deputy observed it. The deputy was not called by the defendant, who has the burden of proof, to describe what he observed. Whatever it was, it was not much if it disappeared without a trace in 17 hours and without any treatment or care.

There is more. The victim's hands were checked in the autopsy and no scratches or bruises were found; this fact would indicate he did not strike the defendant on the head. The victim also had no defensive wounds from which a jury could find he had warning of the knife attack.

I also note the defendant had four book-in photos taken of him when he was booked into jail within hours after the knifing. They are not included in the record on appeal but would have shown the area of the defendant's head in question. The trial court observed these photos at the hearing on the motion for retrial. The appellant has the burden of furnishing a record showing error.

The trial judge in denying a new trial commented as follows:

"First of all, the Court was presented with motions for new trial due to the uncovering of new evidence which was not provided to the defense in response to discovery request. I want to note that there is some question in the Court's mind as to whether or not this evidence, which I'll call the Leeson report, is in fact new evidence as thus defined by statute in that the defendant certainly knew he'd been photographed, apparently told Mr. Graham that, and that those photos might have shown the bump or bruise he had on his head the night of the stabbing.

"In fact, the testimony to the Court was that Mr. Graham asked for those photos and was told that there were none. It would seem that reasonable diligence might require the defendant to subpoena the photographer to inquire as to his observations on the night that he took those photographs if it was felt that those photographs would have shown the bump.

"However, the Court can deal with this issue through its consideration of the materiality of the evidence itself. Both the defendant and J.B. Pritchard testified before the jury that the defendant had a bump on his head after his confrontation with Scott Sanders. This evidence was produced in support of the defendant's self-defense claim.

"Dr. Lora Siegle testified that she found no evidence of a bump some 24 to 48 hours later.

"Now, the unproduced evidence, this Leeson report, would establish that Ron Leeson observed the bump on the defendant's forehead the evening after the stabbing occurred. This evidence, had it been included and given in this trial, would not have been inconsistent with the evidence presented by the State or the defendant.

"Leeson's testimony could have helped establish the existence of a bump which might have aided the defendant's self-defense theory. But the fact that it was gone and no marks remained when the defendant was examined by Dr. Siegle a day later could also be considered to show the injury to be minor and of little consequence and not consistent with the defendant's testimony of being hit and hit and hit. In any event, while this evidence would be relevant, it would only act to supplement and support the testimony of others, which the defendant did present to the jury.

"There's been no indication or evidence here of bad faith or prosecutorial misconduct.

"Having heard all of the evidence at trial, it is my judgment that the inclusion of this evidence would not likely or reasonably produce a different result upon retrial."

The defendant presented no evidence at the hearing on the motion for new trial other than the deputy's report. I would affirm the trial court that the prosecution did not suppress or withhold evidence and, even if it did, the defendant has not shown prejudice.

MCFARLAND, J., joins the foregoing dissenting opinion.