(290 P.3d 661)
No. 106,299

STATE OF KANSAS, *Appellee*, v. BOBBY D. EDWARDS, *Appellant*.

Opinion filed December 14, 2012.

*Shawn E. Minihan*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J. MALONE and STANDRIDGE, JJ.

STANDRIDGE, J.: Bobby D. Edwards was convicted of aggravated robbery. On appeal, he raises several arguments: (1) The State presented insufficient evidence to convict him of aggravated robbery; (2) the district court erred in instructing the jury on aggravated robbery; (3) the district court erred in allowing the State's expert witness to testify at trial; (4) the district court erred when it limited Edwards' direct examination of his expert witness; (5) defense counsel provided him with ineffective assistance; and (6) cumulative errors deprived him of a fair trial. For the reasons stated below, we affirm Edwards' conviction.

## FACTUAL BACKGROUND

During the evening of September 15, 2008, police arrested Edwards and transported him to the hospital after receiving reports

of his causing a disturbance. Edwards appeared to be extremely intoxicated. According to tests conducted at the hospital, Edwards had a blood-alcohol concentration of .375. Because Edwards was fighting with and spitting on hospital staff, he was given a 2.5-milligram, intramuscular injection of Haldol—an anti-psychotic medication that can be given to severely intoxicated individuals who are behaving aggressively to calm them down. Edwards was given a second 2.5-milligram injection of Haldol 10 minutes later. After administering the Haldol, hospital staff reported that Edwards calmed down and went to sleep.

At 1:15 a.m. on September 16, hospital staff reported that Edwards tried getting out of his bed, so he was placed in restraints. At 2:30 a.m., staff reported that Edwards was mumbling incoherently at times. At 4:30 a.m., Edwards sat up but still had slurred speech. At 6 a.m., hospital staff reported that Edwards appeared "clinically sober" and, thus, discharged him from the hospital sometime between 6:30 and 7 a.m.

Shortly after 7:30 that morning, Kristie Zenner heard someone knocking on the front door of an apartment she shared with her boyfriend and her 6-year-old son. Zenner's boyfriend had just left for work, so she thought it was him knocking on the door because he had forgotten something. Zenner got out of bed, walked down the stairs to the first floor of the apartment, and opened the front door. Instead of her boyfriend, Zenner saw Edwards standing in front of her wearing hospital scrubs.

Although she did not know his name at the time, Zenner recognized Edwards as someone who lived in the apartment complex. On one prior occasion, Zenner allowed Edwards to use her phone—while standing outside her apartment—to call someone. After completing his call, Edwards returned the phone to Zenner without incident. Thus, Zenner did not think much of it when Edwards asked her that morning if he could use her phone. Zenner agreed but closed her front door before retrieving her phone for Edwards. After grabbing her phone off of her couch, Zenner turned around and saw Edwards standing near her. Zenner gave Edwards the phone and told him he could use it, but he needed to do so outside. Edwards took the phone but put it in the pocket

of his scrubs. He then looked down at a coffee table next to him and saw a hammer lying on it. Zenner was in the process of moving and had been using the hammer to remove picture nails from her walls. Edwards picked the hammer up, pushed Zenner into a chair behind her, and swung the hammer at Zenner, hitting her in the head. After hitting her, the hammer fell out of Edwards' hand, so he began searching around for the hammer while, at the same time, struggling to keep Zenner seated in the chair.

Zenner managed to stand up from the chair, but Edwards, while standing behind her, placed her in a choke hold. Based on previous training she received in martial arts—and because she was slick from blood oozing from her head—Zenner was able to slip out of Edwards' choke hold. Zenner then saw her phone (which apparently had fallen out of Edwards' pocket during the struggle) lying on the chair. Zenner grabbed the phone, thinking she could quickly dial 911, but Edwards forcibly took the phone away from her before she could do so. Edwards then threw Zenner onto her couch. During her struggle with Edwards on the couch, Zenner yelled out "rape" a couple of times. Edwards responded by saying that he was not going to rape her, that he was just looking for the hammer and that he wanted to take his "evidence" and leave.

At this point, Edwards asked Zenner if she could take him somewhere, but Zenner responded by telling him she could not because she needed medical attention. Edwards then asked Zenner for her keys, but she did not respond to his request. Edwards then said, "[Y]ou can't even give me your keys to save your life?" In response, Zenner said that she needed to go upstairs to put on some clothes (she was wearing only a t-shirt and underwear), but Edwards did not want her to go upstairs. Edwards also asked Zenner several times if anyone else was in the apartment with her, and she eventually told him that her son was upstairs.

Zenner got herself off of the couch, and Edwards frantically searched the living room area for the hammer, going as far as to lift the couch up and toss it across the room before ultimately finding the hammer in what Zenner described as a vase. Because Edwards was facing the front door—his back toward Zenner—when he found the hammer, Zenner believed that Edwards would

simply leave her apartment at that moment. Edwards, however, turned around and swung the hammer at Zenner, again hitting her in the head and causing her to fall into the chair. In response, Zenner kicked Edwards in the groin a couple of times, but the kicks did not incapacitate Edwards. Edwards swung the hammer at Zenner a third time, but she blocked the swing, causing the hammer fall out of Edwards' hand and into Zenner's lap. Zenner immediately grabbed the head of the hammer while Edwards reached down and grabbed its handle.

As both of them held onto the hammer, Zenner told Edwards that he could just leave and take the hammer and her phone with him. At first, Edwards was hesitant, but when he heard Zenner's son crying upstairs, he told Zenner he wanted to leave. He asked Zenner to let go of the hammer, but Zenner told him she was not going to let go. Edwards implied he might hurt her son if she did not let go of the hammer. Zenner, however, convinced Edwards to walk to the door with her while they both held on to the hammer. She then told Edwards she would let go of the hammer once he was outside. Zenner, while holding onto the hammer, opened up the front door and walked outside with Edwards. Zenner then released her grip of the hammer and quickly went back inside her apartment, shutting the front door behind her and locking it.

After washing off some of the blood that was on her, Zenner went to her son's bedroom to calm him. Because Edwards had taken her phone, Zenner had to walk through the basement she shared with her neighbor to ask her neighbor to call 911. While Zenner was waiting for the police to arrive, Edwards knocked on her front door and asked if he could come in to retrieve a bag that he had left. Zenner told him no and that he needed to leave because she had called the police. Edwards eventually walked away from the apartment.

Soon thereafter, police arrived and spoke briefly with Zenner about the incident before EMS transported her to the hospital for treatment. Zenner told police that her neighbor had attacked her and pointed out his apartment to them. The police searched Zenner's apartment and found a red plastic bag that contained hospital papers with Edwards' name on it and a wallet which contained

Edwards' identification and Social Security cards. Officers also searched the apartment that Zenner had identified as Edwards' apartment but did not find anyone inside. Because the door to the apartment next to Edwards' apartment was open, police went inside the apartment and found a silver-colored cell phone with blood on it. Officers later determined that the cell phone belonged to Zenner. Thereafter, police showed Zenner a photo lineup, and she identified Edwards as her attacker. Edwards was later arrested in Oklahoma on October 7, 2008.

The State charged Edwards with attempted murder, aggravated robbery, and aggravated burglary. His case proceeded to a jury trial. The theory of defense presented at trial was that Haldol, the drug Edwards was given at the hospital prior to his later attack on Zenner, caused him to suffer from akathisia (a sensation of inner restlessness) which, in turn, caused him not to understand the wrongfulness of his conduct on the morning of September 16, 2008, or be able to conform his conduct to the requirements of the law. Thus, the defense conceded Edwards committed the acts against Zenner but argued he could not be held criminally liable because he was involuntarily intoxicated when he committed the acts. The jury ultimately found Edwards not guilty of attempted murder and aggravated burglary, but it could not reach a verdict on the aggravated robbery charge. The district court declared a mistrial on the aggravated robbery charge, which resulted in a second trial on that charge. The second trial ended in a mistrial when Zenner, the State's first witness, testified about a prior bad act involving Edwards in violation of an order in limine.

At the third trial, Zenner testified about her encounter with Edwards. Zenner stated she did not notice anything to indicate that he was under the influence of alcohol or drugs while Edwards was inside her apartment. Specifically, she did not notice him staggering, slurring his speech, or having any trouble communicating with her. She said that his train of thought was coherent and that he did not seem to be in a daze. Finally, she did not notice Edwards shaking or suffering from tremors.

Edwards did not testify but presented the testimony of Dr. Mark Goodman, a clinical psychologist who specialized in psychophar-

macology (the study of how mental health medications affect the brain). Dr. Goodman testified that Haldol is an anti-psychotic medication that is generally used to treat psychosis such as schizophrenia. Because the drug can quickly calm down an individual, it can be given intramuscularly to someone with acute alcohol intoxication if that person is angry and acting very aggressively. Dr. Goodman said the typical dosage of Haldol for someone prescribed the drug is 1 to 6 milligrams a day.

Dr. Goodman said that a side effect of taking Haldol is akathisia—a sensation of inner restlessness that can lead to a person feeling confused, aggressive, and can lead to an increase in homicidal or suicidal behavior. Dr. Goodman said someone could experience akathisia 8 hours after being administered Haldol and that the side effect could last beyond 12 hours. He said that administering Haldol to someone after the person has consumed alcohol generally causes that person to be sedated but that the combination of alcohol and Haldol could cause aggressive behavior, delirium, and confusion.

Dr. Goodman testified that he interviewed Edwards for 4½ hours and reviewed his medical records from September 15 and 16, 2008, his past treatment records, the police reports concerning the September 16 incident, and Zenner's statement to the police. Based on his interview of Edwards and his review of the documents, Dr. Goodman concluded there was a greater than 50 percent chance that Edwards suffered from akathisia on the morning of September 16 as a result of being given Haldol several hours earlier at the hospital. Dr. Goodman opined that the akathisia caused Edwards not to appreciate or understand his actions that morning and caused him to be incapable of conforming his conduct to the requirements of the law. Dr. Goodman based his opinion on Edwards' having no memory of the September 16 incident and reporting that Haldol had been given to him in the past, causing his jaw to lock up, making him more irritable, and causing him to hallucinate. Furthermore, Dr. Goodman stated that Edwards' medical records showed that he had been given Haldol in April 1997 and experienced hallucinations, confusion, and anger as a result. Dr. Goodman noted that Edwards' use of Haldol was dis-

continued after that experience. Dr. Goodman also noted that Edwards' behavior during his encounter with Zenner (the aggression he displayed, his nonreaction to being kicked in the groin, the weak neck lock he applied to Zenner, his walking away from the apartment after the altercation, and his return to the apartment in order to retrieve the red plastic bag) indicated to him that Edwards was suffering from akathisia during that time period.

On cross-examination, Dr. Goodman admitted that he was not "a hundred percent sure" whether Edwards would still have had Haldol in his system when he was at Zenner's apartment. He also conceded that Edwards' medical records from September 16 indicated he was not suffering any side effects from Haldol and that he was "clinically sober" when he was released from the hospital. Dr. Goodman also acknowledged that Edwards' previous reaction with Haldol came after being given 10 milligrams of the drug—an amount Dr. Goodman considered as "a high dosage."

Dr. Timothy Rohrig, a toxicologist and director of the Sedgwick County Regional Forensic Science Center, testified as a rebuttal witness for the State. Dr. Rohrig testified that aggressive behavior has been linked as a side effect of chronic Haldol ingestion, but Dr. Rohrig noted that such occurrences were extremely rare. Dr. Rohrig said that he reviewed medical literature regarding Haldol and did not come across a study reporting a person experiencing akathisia or violent behavior as a result of receiving a single-dose administration of Haldol. Dr. Rohrig also said that a person who was not chronically using Haldol but only given a single dose of the drug should experience akathisia—if at all—shortly after being administered the drug. Dr. Rohrig said that it was highly unlikely that a person would start to experience akathisia several hours after receiving the drug due to the concentration of Haldol in the person's system decreasing over time. Finally, Dr. Rohrig said that an acute, one-time administration of Haldol would not cause "mental clouding" in a patient. He said that such a side effect would only be experienced by a very small number of patients who have taken Haldol for several weeks or months.

The district court instructed the jury that in order to find Edwards guilty of aggravated robbery, the State had to prove the following elements:

"1. That [Edwards] intentionally took property from the person or presence of Kristie Zenner;
"2. That the taking was by threat of bodily harm or force;
"3. That [Edwards] was armed with a dangerous weapon; and
"4. That this act occurred on or about the 16th day of September, 2008, in Sedgwick County, Kansas.
"An object can be a dangerous weapon if intended by the user to convince the victim that it is a dangerous weapon and which the victim reasonably believed to be a dangerous weapon."

The district court also instructed the jury on the lesser included offense of robbery and instructed the jury that in order to find Edwards guilty of aggravated robbery or robbery, it had to agree on what underlying act constituted the crime.

During its closing argument, the State argued that Edwards committed aggravated robbery when he used force to take Zenner's phone away from her. The State also argued that the hammer Edwards used to hit Zenner constituted a dangerous weapon for aggravated robbery purposes. The jury ultimately found Edwards guilty of aggravated robbery. The district court sentenced Edwards to 247 months' imprisonment. Edwards filed a timely notice of appeal.

## ANALYSIS

### I. Did the State Present Sufficient Evidence to Support the Jury's Decision to Convict Edwards of Aggravated Robbery?

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, taken in the light most favorable to the State, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. In making this determination, an appellate court does not reweigh evidence, assess the credibility of witnesses, or resolve conflicting evidence. *State v. McClaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011). To the extent that Edwards' claim requires interpretation of Kansas' robbery and aggravated robbery statutes (K.S.A. 21-3426 and K.S.A. 21-3427, respectively), this court applies an unlimited standard of review. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010).

Edwards raises several arguments to support his claim that the State presented insufficient evidence to convict him of aggravated robbery. We address each of these arguments in turn.

A. *Use of Force in Taking the Cell Phone from Zenner*

Edwards contends the evidence presented at trial established he took Zenner's phone away from her prior to any show of force and, although such evidence would support a theft conviction, it is insufficient to support a conviction of robbery and, in turn, aggravated robbery.

Robbery is "the taking of property from the person or presence of another by force or by threat of bodily harm to any person." K.S.A. 21-3426. Aggravated robbery is a robbery "committed by a person who is armed with a dangerous weapon or who inflicts bodily harm upon any person in the course of such robbery." K.S.A. 21-3427. Relevant to Edwards' argument here, theft is defined as obtaining or exerting unauthorized control over property, done with the intent to deprive the owner permanently of the possession, use, or benefit of the owner's property. K.S.A. 21-3701(a)(1).

Our Supreme Court has held that in order for a taking of property to constitute a robbery as opposed to a theft, the perpetrator's use of force against the victim must either precede or be contemporaneous with the perpetrator's taking of property from the victim. *State v. Bateson,* 266 Kan. 238, Syl. ¶ 1, 970 P.2d 1000 (1998). If the taking of the property is completed by the time the perpetrator used force, then no robbery is committed; instead, a theft may have occurred. See *Bateson,* 266 Kan. 238, Syl. ¶¶ 1-3. Thus, we must review all the evidence, in the light most favorable to the State, to determine whether there was sufficient evidence from which a rational factfinder could have found Edwards' use of force against Zenner occurred prior to, or contemporaneous with, taking Zenner's cell phone.

Zenner testified at trial that after she retrieved her phone from the couch, she turned to walk back to the front door and saw that Edwards had already come into her apartment and was standing near her. Zenner gave Edwards the phone and told him he could use it but needed to do so outside. Edwards took the phone and

put it in the pocket of his scrubs. He then picked up a hammer lying on a coffee table, pushed Zenner into a chair that was behind her, and swung the hammer at Zenner, hitting her in the head. After hitting her, the hammer fell out of Edwards' hand, so he began searching around for the hammer while, at the same time, struggling to keep Zenner seated in the chair. Eventually, Zenner was able to stand up from the chair, but Edwards got behind her and placed her in a choke hold. Zenner, however, was able to slip out of Edwards' choke hold. After getting out of the choke hold, Zenner saw her phone lying on a chair in her living room. The phone apparently fell out of Edwards' pocket during his struggle with Zenner. According to Zenner's testimony at trial, she grabbed the phone and tried to quickly dial 911, but Edwards forcibly took the phone away from her before she could do so. Edwards then threw Zenner onto her couch and continued to struggle with her.

When this evidence is viewed in the light most favorable to the State, we conclude that Edwards took possession of the phone the first time without having to use force against Zenner. But after Edwards hit Zenner in the head with a hammer and placed her in a choke hold, Edwards lost possession of the phone because it fell out of his pocket and onto a chair in Zenner's living room. Zenner picked up the phone off the chair, regaining possession of it, but Edwards forcibly removed the phone from her possession a second time. Thus, the evidence presented at trial established that Edwards used force against Zenner before and during his act of taking the phone away from her this second time. Accordingly, we find sufficient evidence to support the jury's finding that Edwards used force prior to or contemporaneous with the taking of property from Zenner.

### B. *Aggravated Robbery Incidental to Another Crime*

Edwards contends he took the phone from Zenner for the sole purpose of facilitating his getaway after battering her. Relying on *State v. Montgomery,* 26 Kan. App. 2d 346, 988 P.2d 258 (1999), Edwards argues a taking that does nothing more than facilitate the commission of another crime is insufficient to support a conviction of robbery and, in turn, aggravated robbery.

In *Montgomery*, the defendant accosted a jogger and attempted to rape her. During the attempted rape, the woman's glasses came off several times, but each time she put her glasses back on. When the attack ended, the defendant grabbed the woman's glasses and left. The glasses were later found near the area where the woman was attacked. The State charged the defendant with attempted rape and aggravated robbery, and he was convicted of both counts.

On appeal, the defendant claimed there was insufficient evidence to support his conviction for aggravated robbery. In support of his claim, the defendant argued the fact that he left the victim's glasses near the scene of the crime establishes that the act of taking property from the victim—a necessary element to the crime of robbery and aggravated robbery—was never completed. The panel rejected the defendant's argument, finding the evidence established that the defendant completed the act of removing the victim's glasses from her possession and thus the element of a taking within the robbery statutes was satisfied. In the process of considering defendant's claim of insufficient evidence, however, the panel found that the only reason defendant took the woman's glasses was "to facilitate his crime of attempted rape and to make it more convenient, as [the victim] might be less able to identify him." 26 Kan. App. 2d at 350. Based on this particular factual finding, the panel concluded it was necessary to decide whether a taking that does nothing more than facilitate the commission of another crime is sufficient to support a conviction for robbery and aggravated robbery. 26 Kan. App. 2d at 348-49. Thus, the panel set out to determine whether the robbery statutes require evidence that a defendant took property by force or threat of bodily harm *and* evidence that the defendant did so intending to permanently deprive the victim of such property.

The panel began its analysis by acknowledging that there is express language in the theft statute that requires a defendant to have intended to permanently deprive the victim of his or her property in order to commit the crime but there is no such language in the robbery statutes. The panel found this troubling:

"[I]t is incongruous that theft—which in this case would be a class A nonperson misdemeanor—requires an intent to permanently deprive the victim of her prop-

erty, but robbery—a [severity] level 5 person felony—does not. More confusing, still, is the fact that theft—which contains an explicit intent requirement—has been defined as a *lesser* degree of robbery. *State v. Long,* 234 Kan. 580, 592, 675 P.2d 832 (1984), *disapproved in part on other grounds [State v. Keeler,]* 238 Kan. 356, 365, 710 P.2d 1279 (1985). *Cf.* PIK Crim. 3d §§ 56.30 and 59.01. How can a *lesser* crime have a *greater* intent requirement?" *Montgomery,* 26 Kan. App. 2d at 349-50.

Citing Supreme Court precedent, however, the panel ultimately determined that—despite the lack of express language—the robbery statutes actually did require a defendant to have taken property with the intention of permanently depriving the owner of it in order to commit the crime. *Montgomery,* 26 Kan. App. 2d at 349-50; see *State v. Adam,* 257 Kan. 693, 697-700, 896 P.2d 1022 (1995). In *Adam,* our Supreme Court reversed a defendant's conviction for aggravated robbery because a supplemental jury instruction on aggravated robbery omitted the essential element that a defendant, in order to be found guilty, must have the general intent to take the property at issue. 257 Kan. at 699-700. The *Montgomery* panel viewed the *Adam* decision as reading "an intent requirement into K.S.A. 21-3426" and, consequently, as supporting the panel's conclusion that an intent to permanently deprive the owner of property is an essential element to committing the crimes of robbery and aggravated robbery. *Montgomery,* 26 Kan. App. 2d at 349-50.

Applying its construction of the robbery and aggravated robbery statutes to the facts of the case, the *Montgomery* panel stated:

"It is clear that the removal of [the victim's] glasses was incidental to the commission of the attempted rape. [The defendant] removed—and then discarded— [the victim's] glasses. Clearly, he did so to facilitate his crime of attempted rape and to make it more convenient, as [the victim] might be less able to identify him. *There is no evidence in the record that* [the defendant] *removed the glasses with an intent to keep them.* All of the evidence leads to the conclusion that he took the glasses to facilitate the crime of attempted rape but *not* to commit the crime of robbery. And without a robbery, there can be no aggravated robbery.

"Under the ruling in *Adam,* the taking of [the victim's] glasses was incidental to the crime of attempted rape and had no significance independent of that crime. The trial court erred in denying [the defendant's] motion for acquittal of the aggravated robbery charge." (Emphasis added.) *Montgomery,* 26 Kan. App. 2d at 350.

For the reasons stated below, we respectfully disagree with the decision of the *Montgomery* panel that intent to permanently deprive the owner of property is an essential element to committing the crimes of robbery and aggravated robbery.

We begin our analysis with the well-known rule of statutory construction:

"When a statute is plain and unambiguous, an appellate court does not speculate as to the legislative intent behind it and *will not read into the statute something not readily found in it.* Where there is no ambiguity, the court need not resort to statutory construction. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history or other background considerations to construe the legislature's intent. [Citation omitted.]" (Emphasis added.) *State v. Urban,* 291 Kan. 214, 216, 239 P.3d 837 (2010).

The language of K.S.A. 21-3426 and K.S.A. 21-3427 is plain and unambiguous. K.S.A. 21-3426 defines robbery as "the taking of property from the person or presence of another by force or by threat of bodily harm to any person." K.S.A. 21-3427 defines aggravated robbery as "a robbery, as defined in K.S.A. 21-3426 and amendments thereto, committed by a person who is armed with a dangerous weapon or who inflicts bodily harm upon any person in the course of such robbery." Kansas appellate courts long have held both robbery and aggravated robbery to be general intent crimes, which only require proof that the defendant engaged in intentional conduct. See *State v. McDaniel & Owens,* 228 Kan. 172, 177, 612 P.2d 1231 (1980) ("Aggravated robbery is not a specific intent crime, it requires only general criminal intent."); *State v. Esher,* 22 Kan. App. 2d 779, 783-84, 922 P.2d 1123 (robbery and aggravated robbery are general intent crimes), *rev. denied* 260 Kan. 997 (1996), *overruled on other grounds State v. Schoonover,* 281 Kan. 453, 133 P.3d 48 (2006); see also K.S.A. 21-3201(a) ("Except as otherwise provided, a criminal intent is an essential element of every crime defined by this code. Criminal intent may be established by proof that the conduct of the accused person was intentional or reckless. Proof of intentional conduct shall be required to establish criminal intent, unless the statute defining the crime expressly provides that the prohibited act is criminal if done in a reckless manner."). Thus, the *Montgomery* panel's decision to in-

corporate a specific intent to permanently deprive the owner of property as an essential element of robbery and aggravated robbery is contrary to the plain and unambiguous language used by the legislature in those statutes.

Moreover, we find the *Adam* opinion provides no support for the *Montgomery* panel's decision to read a specific intent element into K.S.A. 21-3426 and K.S.A. 21-3427. At most, the *Adam* court recognized that aggravated robbery is a general intent crime and that a jury instruction suggesting that the taking of property does not need to be an intentional act constitutes reversible error. *Adam*, 257 Kan. at 697-700. There simply is no language in the *Adam* opinion to suggest that a specific intent element should be read into the robbery and aggravated robbery statutes.

Lastly, and long before the panel decided *Montgomery*, our Supreme Court in *State v. Thompson*, 221 Kan. 165, Syl. ¶ 7, 558 P.2d 1079 (1976), rejected the notion that a specific intent element should be read into the robbery and aggravated robbery statutes. In *Thompson*, the defendant argued the district court should have instructed the jury that in order to find him guilty of aggravated robbery, it had to find that he specifically intended to deprive the owner permanently of the property taken in the robbery. The *Thompson* court disagreed, concluding that neither K.S.A. 21-3426 nor K.S.A. 21-3427 included such an element. *Thompson*, 221 Kan. at 173-75. The court stated:

"*There is no specific intent required beyond the general intent to commit the act of forcible taking. All that is required is an intentional taking of property from the person or presence of another by force or threat of bodily harm.* It has long been the law of Kansas that when the commission of an act is made a crime by statute, without any express reference to any intent, the only criminal intent necessarily involved in the commission of the offense is the intent to commit the interdicted act. [Citation omitted.]

"At common law the crime of robbery as forcible larceny required an *animo furandi*, a specific intent to deprive the owner of the property taken, not temporarily, but permanently. Our former robbery statutes (K.S.A. 21-527 and 21-528 [Corrick 1964]) required a 'felonious' taking as an essential element of robbery. The term 'felonious' was defined as requiring an intent to deprive the owner not only temporarily but permanently of his property, without color of right or excuse for the act, and to convert it to the taker's use without the consent of the owner. [Citations omitted.]

"In enacting K.S.A. 21-3426 and 21-3427 (Weeks 1974) the legislature eliminated the requirement of a 'felonious taking' and required only a 'taking' of the property by threat or force. The language of the new statutes broadened the statutory crime of robbery to cover *any taking of property from the person or presence of another by threat of bodily harm or by force. The requirement of a specific intent to deprive the owner permanently of his property was eliminated. It is sufficient under the present statutes if the taking is done with the general intent to commit the act of taking the property by threat of bodily harm or by force.* . . . It follows that the trial court did not err in failing to instruct the jury that a specific intent to deprive the owner permanently of the property taken is an essential element of the crime of robbery." (Emphasis added.) *Thompson*, 221 Kan. at 174-75.

See also *State v. Poulos & Perez*, 230 Kan. 512, 515, 639 P.2d 477 (1982) (The specific intent to permanently deprive the owner of his or her property is not an element of robbery or aggravated robbery.).

Based on the language used in the statutes and our Supreme Court's holding in *Thompson*, we hold that, regardless of the purpose behind the taking, *any taking of property* from the person or presence of another by force or by threat of bodily harm to any person is sufficient to constitute a robbery under K.S.A. 21-3426. If the perpetrator is armed with a dangerous weapon or inflicts bodily harm upon any person during the course of such a taking, the perpetrator is guilty of aggravated robbery under K.S.A. 21-3427. Likewise, a defendant who takes property by force or by threat of bodily harm for the purpose of facilitating the commission of another crime is guilty of robbery. In holding that a defendant need not act with a specific intent to keep the property taken in order to commit the crime of robbery or aggravated robbery, we acknowledge our decision directly conflicts with the decision reached in *Montgomery*. See *Urban*, 291 Kan. at 223 (Kansas Court of Appeals is not bound by prior rulings of another panel.). "While we must carefully consider each precedent cited to us, we also must uphold our duty to correctly determine the law in each case that comes before us. In doing so, we sometimes find that we must respectfully disagree with the opinion of another panel." *Uhlmann v. Richardson*, 48 Kan. App. 2d 1, 13, 287 P.3d 287 (2012).

Applying the law to the facts here, we find no merit to Edwards' claim of insufficient evidence based on his assertion that he took the property from Zenner for the sole purpose of facilitating another crime; *i.e.*, battering Zenner. The evidence presented at trial to establish that he took property from Zenner by force while armed with a dangerous weapon was sufficient to support his conviction for aggravated robbery.

### C. *Alternative Means of Committing Robbery*

The district court instructed the jury it could find Edwards guilty of aggravated robbery if it found that he, among other things, took property from the *person or presence* of Zenner. Edwards contends the phrase "person or presence" establishes alternative means of committing aggravated robbery and that the State presented no evidence to establish that he took property from Zenner's person. As such, he argues his conviction for aggravated robbery must be reversed under *State v. Wright*, 290 Kan. 194, 224 P.3d 1159 (2010), based on a lack of evidence to support both of these alternative means.

The jury in a criminal case is required to arrive at a unanimous verdict. K.S.A. 22-3421. When the jury is presented with alternative means by which the crime charged can be committed, it is possible for some jurors to arrive at one alternative means to support a conviction and other jurors to settle on another alternative means. Notably, our Supreme Court has held that a defendant's right to a unanimous verdict is not undermined when this happens so long as there was sufficient evidence presented at trial to support each alternative means for committing the crime. See *Wright*, 290 Kan. 194, Syl. ¶ 2; *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 (1994). If there is inadequate evidence to support a particular means for committing the crime, the conviction must be reversed. See *Wright*, 290 Kan. at 203.

Before addressing whether there was sufficient evidence to prove each of the alternative means alleged by Edwards, however, we first must determine whether the aggravated robbery statute truly presents alternative means by which the crime can be committed. If aggravated robbery cannot be committed in more than

one way, jury unanimity is not at issue and an alternative means analysis is inapplicable. The question of whether alternatives within a statute define alternative means is a question of law subject to de novo review. See *State v. Brown*, 295 Kan. 181, 193-94, 284 P.3d 977 (2012).

Our Supreme Court recently clarified the test for identifying whether a statute contains alternative means. The court first noted that " '[t]he mere use of a disjunctive in a statute does not an alternative means crime make.' " *Brown*, 284 P.3d at 988 (quoting *State v. Peterson*, 168 Wash. 2d 763, 770, 230 P.3d 588 [2010]). Instead, courts must look primarily to legislative intent to determine whether statutory alternatives are alternative means. The court summarized the proper analysis as follows:

"[I]n determining if the legislature intended to state alternative means of committing a crime, a court must analyze whether the legislature listed two or more alternative distinct, material elements of a crime—that is, separate or distinct *mens rea*, *actus reus*, and, in some statutes, causation elements. Or, did the legislature list options within a means, that is, options that merely describe a material element or describe a factual circumstance that would prove the element? The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. Often this intent can be discerned from the structure of the statute. On the other hand, the legislature generally does not intend to create alternative means when it merely describes a material element or a factual circumstance that would prove the crime. Such descriptions are secondary matters—options within a means—that do not, even if included in a jury instruction raise a sufficiency issue that requires a court to examine whether the option is supported by evidence." *Brown*, 284 P.3d at 991-92.

K.S.A. 21-3426 defines robbery as the taking of property from the *person or presence* of another, which Edwards argues creates alternative means of committing robbery. Edwards concedes that the State presented evidence from which the jury could find that he took property from the *presence* of Zenner but claims there was no evidence from which the jury could have found he took the property from her *person.*

Our court rejected Edwards' argument in *State v. Boyd*, 46 Kan. App. 2d 945, Syl. ¶ 3, 268 P.3d 1210 (2011), *petition for review filed* January 23, 2012; *cross-petition for review filed* February 6,

2012. The *Boyd* court held that "taking property from the person of the victim and taking property from the presence of the victim do not constitute alternative means of committing aggravated robbery" under K.S.A. 21-3427 because the robbery statutes would criminalize the same sort of conduct had the term "person" been omitted:

"The essence of the crime is forcibly taking property when a person is present. The term 'from the person or the presence' of the victim describes the proximity of the property and the individual. It does so with phraseology that overlaps. Taking property from the presence of the victim (who need not be the owner of whatever the perpetrator seizes) describes an area in the general vicinity of the victim. Taking property from the person of the victim refers to the immediate environs of the body such as a pocket, a purse, or the hands. Thus, a taking 'from the person' is actually encompassed within a taking 'from the presence' of the victim. The robbery and aggravated robbery statutes would criminalize the same range of conduct even if the phrase 'the person' had been omitted from the definitions of those crimes. Accordingly, taking property from the person of the victim and taking property from the presence of the victim do not constitute alternative means of committing aggravated robbery." 46 Kan. App. 2d at 950.

The legal analysis in *Boyd* is well reasoned, persuasive, and has been adopted by other panels of this court. See *State v. Myers*, No. 105,252, 2012 WL 2476978, at *2-3 (Kan. App. 2012) (unpublished opinion), *petition for review filed* July 23, 2012; *State v. Delacruz*, No. 106,082, 2012 WL 1352865, at *4 (Kan. App. 2012) (unpublished opinion), *petition for review filed* May 10, 2012. Although decided prior to *Brown*, the analysis in *Boyd* is entirely consistent with that set forth in *Brown*. Specifically, a determination regarding whether the crime is committed is not a function of how close the property was to the victim when the taking occurred. Rather, the essence of the crime is forcibly taking property when a person is present, regardless of whether the property is found on or near the victim's person.

We conclude that the taking of property from the person or presence of another establishes a single means of committing robbery. Accordingly, there is no merit to Edwards' claim that he was deprived of his statutory right to a unanimous verdict on the aggravated robbery charge. As noted above, the evidence presented at trial shows that Edwards forcibly took Zenner's phone away from

her after she regained possession of it. Thus, sufficient evidence supports the finding that Edwards took property from Zenner's person or presence.

## II. *Did the District Court Err in Instructing the Jury on Aggravated Robbery?*

In this claim of error, Edwards argues that, based on *Montgomery*, the district court should have instructed the jury that in order for the taking of property from Zenner to constitute an aggravated robbery, the taking could not be incidental to another crime. Edwards also argues that the district court should have instructed the jury that the use or threat to use force against Zenner had to precede or be contemporaneous with the taking of property from her in order for the taking to constitute an aggravated robbery.

### A. *The Incidental Taking Instruction*

The district court denied Edwards' request that the jury be instructed that in order to constitute robbery, the taking of property could not be incidental to another crime. Thus, this court applies the following standard of review:

"When the trial court refuses to give a requested instruction, an appellate court must view the evidence in a light most favorable to the party requesting the instruction. A defendant is entitled to an instruction on his or her theory of the case, even if the evidence of the theory is slight and supported only by the defendant's own testimony. However, an appellate court cannot consider the requested instruction in isolation. Rather, the court must consider all of the instructions together as a whole. If the instructions as a whole properly and fairly state the law as applied to the facts of the case, and the jury could not reasonably be mislead by them, the instructions are not reversible error even if they are in some way erroneous. [Citation omitted.]" *State v. Jackson*, 280 Kan. 541, 549-50, 124 P.3d 460 (2005).

As already noted above, our Supreme Court in *Thompson* stated that *any intentional taking of property* from the person or presence of another by threat of bodily harm or by force constitutes a robbery. Thus, in order for a defendant to be found guilty of either robbery or aggravated robbery, there is no requirement that he or she must have specifically intended to keep the property taken from the victim. *Thompson*, 221 Kan. at 173-75. Based on *Thomp-*

*son*, the district court did not err when it denied Edwards' request to instruct the jury pursuant to *Montgomery*.

B. *Preceding or Contemporaneous Use or Threat to Use Force Instruction*

Edwards did not ask the district court to instruct the jury that his use or threat to use force against Zenner had to precede or be contemporaneous with his act of taking property from Zenner. Accordingly, this court applies the following standard of review:

"An appellate court reviewing a district court's giving or failure to give a particular instruction applies a clearly erroneous standard where a party neither suggested an instruction nor objected to its omission. See K.S.A. 22-3414(3). An instruction is clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. [Citation omitted.]" *State v. Martinez*, 288 Kan. 443, 451-52, 204 P.3d 601 (2009).

We will assume, without deciding, for purposes of our discussion that the district court erred in failing to instruct the jury that the use or threat to use force against Zenner had to precede or be contemporaneous with Edwards' act of taking property from Zenner. Given the facts presented at trial and the applicable standard of review, however, we find any such error to be harmless. The evidence presented at trial established that Edwards initially took possession of the phone without having to use force against Zenner. But sometime between hitting Zenner in the head with a hammer and placing her in a choke hold, Edwards lost possession of the phone because it fell out of his pocket and onto a chair in Zenner's living room. Zenner picked up the phone from off the chair, regaining possession of it, but Edwards (according to Zenner's testimony) then forcibly removed the phone from her possession. Thus, the evidence presented at trial established that Edwards used force against Zenner before and during his act of taking the phone away from her the second time. Given this evidence presented, we find no real possibility that the jury would have rendered a different verdict if the requested instruction had been provided to the jury.

III. *Did the District Court Err in Allowing the State's Expert to Testify at Trial?*

Edwards argues that the district court erred when it allowed the State's expert witness, Dr. Rohrig, to testify as a rebuttal witness at trial. At trial, Edwards objected to Dr. Rohrig testifying because the State did not disclose information about Dr. Rohrig to the defense prior to trial pursuant to K.S.A. 2008 Supp. 60-226. Relevant here, the State responded by arguing it was under no obligation to provide discovery to the defense concerning Dr. Rohrig or the nature of his testimony because he was being called as a rebuttal witness and did not perform an evaluation or produce a report concerning his testimony prior to trial. The district court agreed with the State's argument and overruled Edwards' objection, allowing Dr. Rohrig to testify at trial.

As noted by the State, Dr. Rohrig did not testify in the State's case-in-chief but instead testified at trial as a rebuttal witness. With the exception of witnesses called by the State to rebut a defendant's alibi witnesses, see K.S.A. 22-3218, prosecuting attorneys are not required to disclose or endorse names of rebuttal witnesses. See *State v. Drach*, 268 Kan. 636, 646, 1 P.3d 864 (2000); *State v. Trotter*, 245 Kan. 657, 660, 783 P.2d 1271 (1989); *State v. Hunter*, 241 Kan. 629, 638, 740 P.2d 559 (1987); *Talley v. State*, 222 Kan. 289, 292, 564 P.2d 504 (1977). This rule makes sense because the purpose of a rebuttal witness is to refute testimony given in the opposing party's case-in-chief, and it would be hard to list rebuttal witnesses in advance not knowing exactly what detailed testimony may be elicited during the case-in-chief. For this reason, we find the State was under no obligation to disclose Dr. Rohrig as an expert because he testified as a rebuttal witness at trial. Accordingly, the district court did not err when it permitted Dr. Rohrig to testify as an expert.

IV. *Did the District Court Err in Limiting the Testimony of Edwards' Expert?*

Next, Edwards argues that the district court erred when it did not allow him to question his own expert witness, Dr. Goodman, about whether Edwards suffered from a mental illness and whether

the hospital staff should have held Edwards in observation for 48 to 72 hours instead of releasing him on the morning of September 16, 2008. Edwards claims Dr. Goodman's testimony on these two issues was relevant because it would have given the jury a full picture of how Haldol affected his mental state on the morning of September 16.

"The first step when reviewing the exclusion of evidence is to determine whether the evidence is relevant. K.S.A. 60-401(b) defines relevant evidence as 'evidence having any tendency in reason to prove any material fact.' [Citation omitted.] This definition encompasses two components: whether the evidence is probative and whether it is material. [Citations omitted.] Probative evidence is evidence that ' "furnishes, establishes or contributes toward proof." ' [Citation omitted.] It is reviewed under an abuse of discretion standard. [Citation omitted.] Material evidence goes to a fact at issue that is significant under the substantive law of the case. [Citation omitted.] The determination whether evidence is material is reviewed under a de novo standard. [Citation omitted.]" *State v. Garza*, 290 Kan. 1021, 1027, 236 P.3d 501 (2010).

## A.    *Factual and Procedural Background Relevant to this Claim*

As set forth above, Edwards' defense theory at trial was involuntary intoxication. Specifically, he claimed that during his altercation with Zenner on the morning of September 16, he was suffering from akathisia as a result of being given Haldol the previous night at the hospital. Edwards maintained that the akathisia caused him to not understand the wrongfulness of his conduct and rendered him incapable of conforming his conduct to the requirements of the law. K.S.A. 21-3208(1) describes the defense of involuntary intoxication:

"The fact that a person charged with a crime was in an intoxicated condition at the time the alleged crime was committed is a defense only if such condition was involuntarily produced and rendered such person substantially incapable of knowing or understanding the wrongfulness of his [or her] conduct and of conforming his [or her] conduct to the requirements of law."

Before Edwards' first trial, the district court ruled that Edwards could not elicit testimony from Dr. Goodman that Edwards suffered from a mental illness or that hospital staff should have kept Edwards under observation instead of discharging him on the morning of September 16. Specifically, the district judge stated:

"Before we get to opening statement, there's some issues that we need to make a record on. The issue has come up on two subjects: One is the degree to which evidence of Mr. Edwards' bipolar condition·or other mental health issues can be admitted or mentioned to the jury; the second is the statement found in Dr. Goodman's report having to do with the practice of hospitals of keeping individuals, who have been administered Haldol, under observations for 48 to 72 hours. Let me take up the first issue on the mental health and mental illness. Dr. Goodman states in his report that Mr. Edwards has a severe mental illness. And he references in his primary report that, in his opinion, his diagnostic impression is that Mr. Edwards sufferers from a bipolar disorder, a psychotic disorder, and a polysubstance dependence. He gives an Axis-II diagnosis of a paranoid personality disorder. It seems to me that the defense that's been raised in this case is one of intoxication, and that defense is governed by statute, specifically K.S.A. 21-3208. [K.S.A.] 21-3208 contemplates a defense in certain circumstances where an individual is intoxicated to the point where he is substantially incapable of knowing or understanding the wrongfulness of his conduct and conforming his conduct to the requirements of the law. So the question is whether or not the alcohol and the Haldol that was given to Mr. Edwards rendered him substantially incapable of knowing or understanding the wrongfulness of his conduct. The report prepared by Dr. Goodman does not allege that Mr. Edwards was suffering from a mental defect that would give rise to the defense of insanity or the defense of lack of mental state as set forth in K.S.A. 22-3219 and [K.S.A.] 22-3220. And because that's not what Dr. Goodman is going to say, then it seems to me the testimony of Dr. Goodman should be limited to the defense which has been asserted, which is one of intoxication. We take Mr. Edwards as we find him with his current physical and mental state. And the question for the jury is given that current physical and mental state, was the ingestion of alcohol to the degree to which Mr. Edwards has—has shown by the evidence to have consumed alcohol on the times in question, and was the administration of Haldol such to render him substantially incapable of knowing or understanding the wrongfulness of his conduct, and rendered him incapable of conforming his conduct to the requirements of the law. I don't want the jury confused about that defense, and so I'm ruling that Dr. Goodman should confine his testimony to what he knows about the effects of Haldol and what he knows about the effects of alcohol, and then he can—he can testify as to his knowledge of the effects of those intoxicants on somebody with Mr. Edwards' known physical and mental condition. And then beyond that, I don't want Dr. Goodman testifying as to what that physical and mental condition is, because I don't want the jury deliberating on a defense that is not presented, and I don't want the jury confusing the mental defect defense found in K.S.A. 22-3219 and [K.S.A. 22-32]20 with the defense that's asserted under K.S.A. 21-3208. Similarly, Dr. Goodman's opinion that the hospital should have kept Mr. Edwards under observation for 48 to 72 hours, it seems to me leads the jury down a trail that doesn't lead to anywhere. What's important under the defense and the statute is what was Mr. Edwards' mental state after having consumed alcohol and after

having been administered Haldol at the time that these crimes were alleged to have occurred, and whether the hospital should have kept him under observation or not is—is irrelevant."

The district court judge who presided over Edwards' first trial did not preside over his second trial (which ended in a mistrial) or his third and final trial. At the third trial, the district court reaffirmed the limitations previously imposed on Dr. Goodman's testimony. Defense counsel objected to this ruling.

At trial, Dr. Goodman testified that he interviewed Edwards for 4½ hours and reviewed his medical records from September 15 and 16, 2008, his past treatment records, the police reports concerning the September 16 incident, and Zenner's statement to the police. Based on his interview of Edwards and his review of the documents, Dr. Goodman concluded there was a greater than 50 percent chance that Edwards suffered from akathisia on the morning of September 16 as a result of being given Haldol several hours earlier at the hospital. Dr. Goodman opined that the akathisia caused Edwards not to appreciate or understand his actions that morning and incapable of conforming his conduct to the requirements of the law. Dr. Goodman stated that his opinion was based on Edwards having no memory of the September 16 incident and reporting that he had been given Haldol in the past which caused his jaw to lock up, made him more irritable, and caused him to hallucinate. Furthermore, Dr. Goodman stated that Edwards' medical records showed that he had been given Haldol in April 1997 and experienced hallucinations, confusion, and anger as a result. Dr. Goodman noted that Edwards' use of Haldol was discontinued after that experience. Dr. Goodman also stated that Edwards' behavior during his encounter with Zenner (the aggression he displayed, his nonreaction to being kicked in the groin, the weak neck lock he applied to Zenner, his walking away from the apartment after the altercation, and his return to the apartment in order to retrieve the red plastic bag) indicated that Edwards was suffering from akathisia during that time period.

### B. *Analysis*

Edwards argues that whether he suffered from a mental illness and whether the hospital staff should have held him in observation for 48 to 72 hours instead of discharging him on the morning of September 16 constituted relevant evidence because it would have established how Haldol affected his mental state on September 16. We agree that the effect Haldol had on Edwards' mental state on September 16 was a material issue at trial, given the fact that Edwards raised an involuntary intoxication defense based on hospital staff administering Haldol to him the previous night. See K.S.A. 21-3208(1) (Intoxication is a defense to a crime "if such condition was involuntarily produced and rendered such person substantially incapable of knowing or understanding the wrongfulness of his [or her] conduct and of conforming his [or her] conduct to the requirements of law.").

Given the record before us, however, it is unlikely that evidence of Edwards' mental illness would have been probative to the issue of how Haldol affected his mental state on September 16. If there had been evidence presented to establish that people suffering from a certain type of mental illness were particularly susceptible to suffering from akathisia (which, in turn, rendered them involuntarily intoxicated) as a result of being administered Haldol, then evidence of Edwards suffering from the same type of mental illness would have been probative to establishing what his mental state was on September 16 as a result of being given Haldol. This is especially true given the fact that Dr. Rohrig's rebuttal testimony indicated that akathisia—as a side effect of Haldol—was extremely rare in the *general* population. Edwards, however, does not claim in his brief—and the record on appeal does not show—that he ever proffered evidence showing that he suffered from a mental illness that made him particularly susceptible to suffering from akathisia as a result of taking Haldol. Instead, it appears that Edwards merely wanted Dr. Goodman to testify that Edwards, in addition to being given Haldol, also suffered from a mental illness. Such testimony would not constitute probative evidence establishing his mental state on September 16 *as a result of being administered*

*Haldol.* Accordingly, the district court did not abuse its discretion in preventing Dr. Goodman from testifying about Edwards' mental illness. Furthermore, it appears that Edwards was not prejudiced by the district court's decision given the fact that Dr. Goodman, without mentioning Edwards' mental illness, was able to testify at trial that Edwards was involuntarily intoxicated on the morning of September 16 as a result of being given Haldol the previous night.

With regard to Dr. Goodman's testimony stating that the hospital should have held Edwards in observation for 48 to 72 hours instead of discharging him the morning of September 16, Edwards argues this evidence also was probative to the issue of Haldol's effect on him. But evidence that the hospital staff should have kept Edwards for observation instead of discharging him would not have aided the jury in deciding the central issue of the case: whether Haldol rendered Edwards substantially incapable of knowing or understanding the wrongfulness of his conduct and of conforming his conduct to the requirements of law when he encountered Zenner on September 16. The evidence does nothing to help the jury understand Edwards' actual mental state on September 16 as a result of being administered Haldol. Thus, the district court did not abuse its discretion in preventing Goodman from testifying about whether the hospital should have kept Edwards in observation.

## V. *Did Defense Counsel Provide Ineffective Assistance of Counsel?*

Next, Edwards argues that his attorney, Blake Cooper, committed numerous errors at trial which constituted ineffective assistance of counsel: (1) Cooper failed to have Edwards' sister, Amber, testify at trial so she could contradict Detective David Crump's statement at trial that he never contacted Edwards' family during his investigation of the case; (2) Cooper failed to have Edwards' mother, Linda, testify at trial about a statement Crump made to her that would have supported an involuntary intoxication defense; (3) Cooper failed to interview Axell Lopez Lara, a neighbor of the victim; (4) Cooper should have asked Dr. Rohrig whether hospital staff erred when they administered Haldol to Edwards due to him hav-

ing alcohol in his system and having low blood potassium; and (5) Cooper should have questioned Zenner about bruises on her arm and investigated her phone records.

Generally, claims of ineffective assistance of counsel are not appropriate on direct appeal. Such claims usually are raised in the context of a postconviction motion filed with the district court so that an evidentiary hearing can be held to resolve any dispute in material fact. This court can consider such a claim on direct appeal, however, when the record is sufficient to consider the claim. See *State v. Paredes*, 34 Kan. App. 2d 346, 348-49, 118 P.3d 708, *rev. denied* 280 Kan. 989 (2005).

In this case, the district court held a preliminary hearing on Edwards' pro se motion claiming that he received ineffective assistance from Cooper. At this hearing, Edwards was allowed to testify about all the reasons he believed Cooper provided ineffective assistance of counsel to him. After Edwards was finished testifying, the district court ruled that all of Edwards' claims—except for one—did not constitute ineffective assistance of counsel and thus denied those claims without hearing further evidence. The one issue that the court believed potentially raised a meritorious claim of ineffective assistance was Edwards' claim that Cooper should have interviewed Lara. As such, the district court heard testimony from Cooper on this single issue. After hearing Cooper's testimony, the district court ruled that it was proper for Cooper to forego interviewing Lara based on the involuntary intoxication defense he raised at trial. After making this ruling, the district court denied Edwards' motion in its entirety.

Because Edwards was able to testify at trial regarding his claims and the district court heard limited testimony from Cooper, we find it appropriate to address the district court's decision to deny Edwards' motion in this direct appeal. Because the district court held a preliminary hearing where it heard limited evidence, we apply the same standard of review as when a district court conducts the same type of hearing to address the merits of a K.S.A. 60-1507 motion. This court reviews the district court's factual findings to ascertain whether they are supported by substantial competent evidence and are sufficient to support the district court's legal con-

clusions. This court applies a de novo standard of review to the district court's ultimate conclusions of law. *Bellamy v. State*, 285 Kan. 346, 354, 172 P.3d 10 (2007).

In order to demonstrate that trial counsel was ineffective, a defendant must establish two essential elements: (1) counsel's performance was constitutionally deficient and (2) but for counsel's deficient performance there is a reasonable probability that the movant would have obtained a more favorable outcome. *Rowland v. State*, 289 Kan. 1076, 1083, 219 P.3d 1212 (2009). To prove counsel's performance was deficient, the movant must show that counsel made such serious errors that counsel's legal representation was less than what is guaranteed by the Sixth Amendment to the United States Constitution. *Harris v. State*, 288 Kan. 414, 416, 204 P.3d 557 (2009). Edwards has the burden to show by a preponderance of the evidence that Cooper's representation was deficient and prejudiced him. See *State v. Barahona*, 35 Kan. App. 2d 605, 611, 132 P.3d 959, *rev. denied* 282 Kan. 791 (2006).

## A. *Amber Edwards*

At the evidentiary hearing, Edwards testified that Cooper "deceived" him into believing that Amber could not be called to testify on his behalf at trial to rebut Detective Crump's claim that he never spoke with Edwards' family. Notably, at Edwards' first trial, Crump was asked whether he spoke to members of Edwards' family. Crump said he could not remember if he spoke with Edwards' mother, but he did admit to speaking to Edwards' two sisters. At the third trial, Crump was not asked any questions about whether he spoke to Edwards' family. Accordingly, there would have been no purpose in having Amber testify about Crump speaking to Edwards' family. Crump admitted doing so at the first trial, and the issue was never brought up at the third trial. Consequently, Edwards cannot show that Cooper erred in failing to have Amber testify at trial or that he was prejudiced by Cooper's decision.

## B. *Linda Edwards*

Edwards said that he told Cooper that Linda could testify about a conversation she had with Crump during which Crump told

Linda that Edwards had been taken to the hospital after displaying bizarre behavior and that the hospital staff had given him a shot which caused him to be more irritated. Edwards argued that this testimony would have supported his claim of involuntary intoxication. The record shows that before Edwards' first trial began, Cooper asked the district court to allow Linda to testify about a detective (she did not know his name) who told her that the police were looking for Edwards and that he had been "released too soon from the hospital." Cooper argued that this evidence was relevant to show that Edwards should not have been released from the hospital on September 16. The district court found that Linda's testimony would constitute inadmissible hearsay and thus did not allow her to testify.

As already mentioned, Crump testified at the first trial that he could not remember whether he had spoken to Linda. Crump also testified at the first trial that he did not even become aware of this case until after lunch on September 16—long after Edwards was released from the hospital and attacked Zenner. Crump was never asked at the first trial whether he spoke to any members of the hospital staff who treated Edwards on September 15 and 16. At the third trial, Crump testified that he conducted some investigation regarding Edwards' stay at the hospital, but he could not remember whether he actually spoke to anyone from the hospital.

The record shows that Cooper attempted to have Linda testify about her conversation with an unnamed detective, but the district court found that such evidence constituted inadmissible hearsay and, thus, denied Cooper's request. Furthermore, the record does not support Edwards' claim that Crump spoke to Linda or that he told her that hospital staff had given Edwards a shot which irritated him. Even if we assume that Crump made such a statement to Linda, it is unlikely that having Linda testify about the statement at trial would have changed the outcome, given the fact that Dr. Goodman testified extensively about Haldol being administered to Edwards at the hospital and opined that this drug caused Edwards to be involuntarily intoxicated when he encountered Zenner on September 16. Linda's testimony would have added very little to

Edwards' involuntary intoxication defense—an argument the jury rejected by finding Edwards guilty of aggravated robbery.

Cooper's failure to have Linda testify at trial about an alleged conversation she had with Crump was not deficient performance and did not prejudice Edwards.

### C.   *Axell Lopez Lara*

Edwards testified at the ineffective assistance of counsel hearing that his attorney failed to speak with Lara, a neighbor of Zenner's who had contact with Zenner on the morning of the incident. Edwards said he was not aware of what evidence Lara could have provided to his defense, but he said that he "just felt like it would be good trial strategy to find out what she had to say, at least send an investigator to talk to her."

Cooper testified that Edwards approached him about contacting Lara and told him that Lara might testify that Zenner went back into her apartment and rearranged some of her furniture in order to make her apartment look worse for insurance purposes. Cooper decided not to investigate this claim because he believed it would not make any sense to attack Zenner's credibility, given the fact that Edwards' defense at trial was involuntary intoxication and, therefore, Edwards would not dispute the fact that he attacked Zenner in her apartment.

If counsel has made a strategic decision after making a thorough investigation of the law and the facts relevant to the realistically available options, then counsel's decision is virtually unchallengeable. Strategic decisions made after a less than comprehensive investigation are reasonable exactly to the extent a reasonable professional judgment supports the limitations on the investigation. *Rowland*, 289 Kan. at 1083-84. Cooper's decision to not interview Lara constituted a reasonable professional judgment. Lara's alleged testimony would not have supported Edwards' defense at trial. The jury could have perceived such testimony as a needless attack on the credibility of Zenner.

## D. *Dr. Rohrig*

Edwards testified that he was aware, based on the directions printed on a container of Haldol, that a person should not take the drug if he or she has consumed alcohol or has low blood potassium. Edwards testified that his toxicology report from the hospital stated that he had low blood potassium and had alcohol in his system. Based on this information, Edwards claimed that Cooper should have asked Dr. Rohrig whether it was correct for hospital staff to administer Haldol to Edwards.

Whether hospital staff erred in administering Haldol to Edwards was irrelevant to determining the main issue at trial—whether the Haldol rendered Edwards involuntarily intoxicated during the time he attacked Zenner. Furthermore, Edwards' expert witness, Dr. Goodman, testified about the effect Haldol has on a person who has consumed alcohol, eliminating the need for Cooper to ask Dr. Rohrig about the subject on cross-examination and risk having him give an answer unfavorable to Edwards. With regard to the low blood potassium, Dr. Goodman, who reviewed all of Edwards' medical records from September 15 and 16, did not mention anything about low blood potassium contributing to a person having a bad reaction to Haldol. This would indicate that a low blood potassium level would have no bearing on determining whether Haldol rendered Edwards involuntarily intoxicated. Accordingly, the record does not support Edwards' claim that Cooper's failure to ask Dr. Rohrig on cross-examination about alcohol and low blood potassium constituted deficient performance or prejudiced Edwards at trial.

## E. *Kristie Zenner*

Edwards testified that he asked Cooper at trial to question Zenner about bruises on her arms, which she claimed resulted from her encounter with Edwards. Edwards believed that the bruises were caused by Zenner's boyfriend. Edwards said that Cooper declined his request to question Zenner about the cause of the bruises because Cooper believed it would be a bad idea to attack Zenner on the stand. Edwards also testified that Cooper should have investigated the records of the phone he took from Zenner. When

asked why those telephone records were significant, Edwards said, "I just wanted to know who used the phone. I mean, they say that she gave me the phone. I was just wondering, you know, what the record would show."

Because Edwards' defense at trial was involuntary intoxication, he did not dispute Zenner's claim that he entered her apartment, attacked her, and took property from her. The only issue that was in dispute was whether Edwards was substantially incapable of knowing or understanding the wrongfulness of his conduct and of conforming his conduct to the requirements of law when he committed these acts. Accordingly, Cooper made a reasonable, strategic decision when he declined to question Zenner about the cause of the bruises on her arm, given the fact there was no dispute that Edwards had attacked her and caused her injuries. Furthermore, it was appropriate for Cooper to forego acquiring Zenner's phone records, given the fact that there was no dispute that Edwards took Zenner's phone away from her. The phone records would not have provided any evidence to support Edwards' involuntary intoxication defense.

For all of these reasons, we affirm the district court's decision to deny relief to Edwards based on his claims of ineffective assistance of counsel.

VI. *Did Cumulative Error Deprive Edwards of His Right to a Fair Trial?*

Finally, Edwards claims that he is entitled to have his aggravated robbery conviction reversed based on cumulative trial error.

Although one error may not warrant reversal, cumulative errors, considered collectively, may warrant reversal where the totality of the circumstances demonstrate the errors substantially prejudiced and denied the defendant a fair trial. *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009). But a single error cannot constitute cumulative error. *State v. Foster*, 290 Kan. 696, 726, 233 P.3d 265 (2010). Based on the above analysis, Edwards has failed to establish that any errors occurred during his trial; thus, there is no merit to Edwards' claim of cumulative error.

Affirmed.